**GREAT NORTHERN RAILWAY COMPANY**

**v.**

**The UNITED STATES.**

**No. 382-59.**

United States Court of Claims.

Jan. 11, 1963.

Elmer B. Trousdale, St. Paul, Minn., for plaintiff.

John Charles Ranney, Washington, D. C., with whom was Acting Asst. Atty. Gen., Joseph D. Guilfoyle, for defendant.

DURFEE, Judge.

In this case plaintiff, a common carrier by railroad, seeks to recover $24,474.90 in demurrage charges from the Government for the detention of 569 rail carloads of ammunition for cannon and other munitions during the period July 17, 1950, to October 14, 1950. These 569 Government-owned shipments moved under Government bills of lading from other states to Gold Bar, Washington, during the period in question.

Initially, the 569 shipments were consigned to the port of Mukilteo, Washington (located on the lines of plaintiff approximately 20 miles north of Seattle), and all 569 shipments were moved toward that port via southern routes through Bieber, California, Portland, Oregon, or Seattle, Washington. Upon arrival at Interbay, Washington (a substation of Seattle), the Government issued diversion orders changing the destination from Mukilteo to Gold Bar, Washington. At Gold Bar the 569 shipments were not unloaded but were held on plaintiff's tracks for periods ranging from several days to two weeks. At the end of this detention, the Government issued a second bill of lading requiring that the shipments be transported from Gold Bar back to Mukilteo, Washington, or Lacoda, Oregon, where they were presumably transloaded onto vessels for overseas shipment.

Demurrage is defined for the purpose of this case as a carrier's charge to the shipper for detention of a car beyond the free time published in tariffs for loading, unloading, diversion, reshipment, etc. Demurrage charges are governed by published tariffs and orders of the Interstate Commerce Commission.

Rule No. 2 of Jones Tariff 4–Z, entitled "Free Time Allowed" provides:

"Twenty-four hours' (one day) free time will be allowed: 1. When cars are held for reconsignment, diversion or reshipment, or held in transit on orders of consignor, consignee or owner."

Plaintiff relies upon the above tariff provisions to establish its claim for demurrage *after 24 hours' free time*, because the cars were held at Gold Bar *for reshipment.*

However, Item 10 of Tariff 4–Z contained a "General Exception" which provided:

"The following cars are not subject to Demurrage Rules and Charges, published in Section No. 1, pages 39 to 50, inclusive.

* * * * * *

"(b) At the ports on cars containing freight for trans-shipment to or from vessels and at Brownsville, Eagle Pass, El Paso, Laredo and Presidio, Texas, on cars containing export traffic, when rules and charges applicable thereto are provided in the tariffs of the individual carriers lawfully on file with the Interstate Commerce Commission, except to the extent indicated in such tariffs. This exception also applies to such cars *when held in transit* because they cannot reasonably be accommodated at the ports." [Emphasis supplied.]

Defendant contends that the shipments involved were "held in transit" at Gold Bar within the purview of this General Exception contained in 4–Z.

Defendant also relies upon North Pacific Coast Freight Bureau Local Freight Tariff 28–I "Naming Demurrage Charges and Free Time Allowance On Cars Held at North Coast Points of

Interchange * * * For Delivery to Water Carriers," which provides in part:

"Free Time:

"On Carload Freight Originating at Points in the United States * * and Destined to Points in other foreign countries; * * * Free Time Allowed for Unloading 240 hours (10 days)."

Note 1 of said Tariff 28–I to which item 55 of that tariff was subject to provided:

"Free time is to be computed from first 7:00 A.M. *after notice of arrival at port * * * or of carriers' readiness to deliver at port,* except on freight as mentioned in Note 3, on which free time is to be computed from first 7:00 A.M. after disposition order is received, without further notice of arrival." [Emphasis supplied.]

At this point, careful scrutiny of the actual details of the billing and movement of the 569 shipments is essential. The parties have agreed upon 31 shipments as typical of all. The original intention of the Government was that all of these carload shipments of ammunition were destined for the port of Mukilteo, as evidenced by the original Bills of Lading. When the shipments reached the intermediate point of Interbay, they were diverted by Government order, stamped on the Bills of Lading, to Gold Bar.

Unlike Mukilteo, Gold Bar was not a port of the interchange of lading with water carriers, but was a separate railroad station 32.9 miles east and inland of Mukilteo. To reach Gold Bar from Interbay, the shipments moved north through Mukilteo to Everett, thence east to Gold Bar. The cars were diverted to Gold Bar because ammunition could not be held within the congested port area for over 24 hours, and because of congestion of port facilities at Mukilteo. Upon arrival plaintiff railroad promptly advised the Government of the day and hour of the arrival at Gold Bar. This notice served to set the "free time" period running under either Tariff 4–Z or 28–I. The cars were not unloaded, but were set out on storage tracks and held for periods ranging from about one day to two weeks. No Government facilities for receipt or storage of ammunition were located at Gold Bar.

Subsequent to the detention of the cars at Gold Bar, a second bill of lading was issued by the Government for each of the shipments from Gold Bar back to Mukilteo, except 12 cars to the port of Lacoda, Oregon.

Defendant treated the shipments as terminating at Gold Bar for the purpose of constructing the transportation rate for line haul service to Gold Bar and for the rate from Gold Bar to Mukilteo, although defendant knew that the ultimate destination was Mukilteo for trans-shipment at the port. In Memphis Merchants Exchange v. I. C. R. R., 43 ICC, 378, the Interstate Commerce Commission stated:

"Manifestly the shipper * * * cannot treat the different stages or steps of the completed movement of the traffic as a single unit for some purposes, and as separable or local movements, in part for other purposes."

Note 3 to Rule 2 of Tariff 4–Z defines a reshipment as: "the making of a new contract by which under a new rate the entire original lading, without being unloaded, is forwarded in the same car to another destination." The diversion order to Gold Bar and the second bill of lading from there to Mukilteo formed "a new contract, * * * under a new rate." Under such circumstances, it would appear that the cars were not held at Gold Bar *in transit* to Mukilteo under Tariff 28–I, but were held *for reshipment* to Mukilteo under Rule 2 of Tariff 4–Z, which allows 24 hours' free time when cars are held *for reshipment.* When the Government itself issued a second bill of lading for the movement from Gold Bar to Mukilteo under a new rate, it certainly determined that the cars were not *in transit* to Mukilteo when they were held at Gold Bar, within the meaning of the General Exception contained in Tariff

4-Z—Item 10 relied upon by defendant. Neither can it be said that the cars were held at Gold Bar within the provision of Tariff 28-I which provides "Free Time Allowed for Unloading—240 hours (10 days)." These shipments were not held at Gold Bar for *unloading* at Gold Bar; there were no facilities there for unloading.

Defendant's position is that carriers' notice to it of "readiness to deliver at the port" constitutes delivery; that since a constructively-placed car is not in an accessible place for unloading, as Gold Bar, a *notice* to the consignee of this constructive placement at Gold Bar constitutes notice of carriers' readiness to deliver at the port of Mukilteo, and commenced the running of the *10 days free time* allowance authorized by Tariff No. 28-I.

The carrier did not deliver a notice to the Government of "readiness to deliver at port," or a "notice of arrival at port" as provided for the computation of free time under Tariff 28-I, Note No. 1, supra. The carrier served a notice of arrival *at Gold Bar.* Gold Bar was not a port, it was a separate station over 32 miles inland from the port. The shipper by its diversion order named Gold Bar as the destination of the shipments, and subsequently treated Gold Bar as the origin of the shipments to Mukilteo in the new bills of lading and the transportation rate. There was no constructive delivery or placement of the cars at Mukilteo while they were held at Gold Bar.

We can find no applicable exception to the provisions of Jones Tariff 4-Z with 24 hours' free time on assessment of demurrage and conclude that it governs in this case.

However, defendant also takes the position that negotiations between the parties during 1950 show that plaintiff agreed with defendant on 10 days' free time allowance at Gold Bar; also that these negotiations constituted a special Section 22 Quotation applicable to this specific situation.

The substance of these negotiations is set forth in our Findings of Fact. About halfway between July and October 1950, the period over which these shipments were made, representatives of the Government and the railroad met on August 10, 1950 and discussed shipments of ammunition destined for Mukilteo and held at Gold Bar. The memorandum of this meeting appeared to contemplate 10 days' free time for holding at Gold Bar or Mukilteo, but concluded that the Railroad would consider this as providing for a request to be made in writing by the Government to the Railroad's General Freight Traffic Manager. This request was submitted in letters from the Government dated August 17 and 18, 1950 to plaintiff, to which it replied on October 16, 1950. Although there was clear agreement that shipments to Mukilteo came under Tariff 28-I with 10 days' free time, there was no clear understanding as to shipments destined for Gold Bar, and subsequently reshipped to Mukilteo. In any event, the final reply by the Railroad's Traffic Manager was received by the Government after the movements of the shipments involved in this case and was not retroactive.

Following these negotiations, representatives of the parties met on November 14, 1950 to certify the demurrage bills for the shipments in suit. After this meeting, the Government transportation officers were satisfied that the demurrage was properly assessed on the basis of 24 hours' free time on those shipments. For the most part, certification of the bills was then stamped on the back of each demurrage by the Government officers on this basis as a proper charge. On January 22, 1951 the bills were readited and overpayments of about $8,400 were refunded by the Railroad to the Government. At this second meeting no question was raised as to the proper amount of free time on the shipments in suit, and the demurrage bills were paid on the basis of 24 hours' free time. This determination was not questioned until several years later when the

Government deducted the amount for which plaintiff now sues from other payments due plaintiff.

We conclude that this settlement and payment in 1950 and 1951 by defendant to plaintiff of the demurrage bills on the shipments in suit on the basis of 24 hours' free time at Gold Bar was correct; that the cars were held at Gold Bar for *reshipment* under Tariff 4–Z and not held *in transit* to Mukilteo under Tariff 28–I; that the free time for demurrage at Gold Bar was 24 hours; and that there was no final agreement between the parties to the contrary.

Defendant also asserts that part of plaintiff's claim is barred by a judgment of this court in 1959 in favor of plaintiff [1] for additional line-haul charges on most of the shipments here in suit, upon which the Government paid plaintiff $104,808.04. Defendant cites 28 U.S.C. § 2517(b) which provides:

> "Payment of any such judgment and of interest thereon shall be a full discharge to the United States of all claims and demands arising out of the matters involved in the case or controversy."

Defendant also relies on language in the preamble to the court's order of July 2, 1957, adopting revisions to the court's procedures in common carrier cases, in part as follows:

> "* * * In order to secure a more expeditious disposition of these cases by * * * (b) limiting the issues to carrier's bills which are actually in dispute; * * *"

The Government's position is that the basis of all suits filed in this court after adoption of this rule is the original "bill in dispute" in the prior rate case in this court—viz. the original bill of lading; therefore a judgment on that bill of lading is res judicata as to all relevant issues which could have been but were not raised concerning that bill of lading, including the issue of demurrage in the present case.

Although plaintiff's cause of action for additional line-haul charges in the case formerly adjudged by this court arose out of the same transaction (the bill of lading), the present action is based on bills for demurrage which are separate and distinct from the bills for transportation charges. Before these two cases came to issue in this court, the Government had asserted its deductions from the carrier for transportation charges separately from its deductions for demurrage by separate overpayment notices, and by separate deductions at widely different times. Demurrage charges are no part of the rate charges in effect for transportation of the shipment. Although they may follow the shipment and be collected together with the transportation charges, they are for a distinct and separate service. Krause Brothers Lumber Co. v. Director General, 92 ICC 450–452. In the former case in this court, judgment for plaintiff was entered upon agreement between the parties on an amount in full settlement of all claims asserted for additional transportation charges. No claims for demurrage were there asserted and the prior judgment is not res judicata as to the present case. Plaintiff's claim is not barred by 28 U.S.C. § 2517 or the December 2, 1957 rule of this court as to carriers' bills.

Defendant has counterclaimed for $12,966.69, based upon a re-computation by defendant of the rates for line-haul service of moving several of the shipments involved from Bellemont, Arizona to Gold Bar, Washington. Demurrage is not involved.

Plaintiff concedes that defendant is entitled to recover $4,240.33 on the counterclaim, but disputes the remainder of $8,756.36.

There was no single factor through-rate applicable between the point of origin (Bellemont) and the billed destination (Gold Bar). Where no rate is named from point of origin to destination

1. Great Northern Railway v. United States, Ct.Cl. No. 10–59, order entered July 31, 1959.

for a shipment via the route of movement, the lowest combination of rates applicable via the route of movement is the legal rate.

In arriving at its "lowest combination of rates applicable" the Government has combined regular published tariff rates for part of the route of movement with a Section 22 Quotation rate for the other part. A Section 22 Quotation is defined as a special rate tender authorized under 49 U.S.C. § 22 by which the carrier offers transportation to special persons free or at rates reduced from those provided under published tariffs.

Defendant grants that insofar as the general shipping public is concerned the rates used in constructing a combination through-rate must be published and filed rates, under Tariff Circular 20 of the Interstate Commerce Commission in effect at the time of movement. However, defendant asserts that Section 22 of the Interstate Commerce Act, 49 U.S.C. § 22, provides in part:

> "Nothing in this chapter shall prevent the carriage * * * of property free or at reduced rates for the United States, * * *."

This section further provides that these reduced rates may be entered into without regard to any other section of Part I of the Act including Section (6) pertaining to tariffs filed with the Commission and posted.

Defendant argues that as a consequence of this legislative exemption, the Section 22 Rates would not be subject to the administrative ruling of the Commission requiring that all rates used in making combination through-rates must be filed with the Commission. Defendant cites an excerpt from the opinion of this court in Great Northern Railway Company v. United States, Ct.Cl., 312 F.Supp. 901:

> "On the other hand, if a § 22 quotation rate reveals an intention that it may be so used, it may be combined with another quotation rate to produce an aggregate rate lower than the through tariff rate. * * * And perhaps, since the Government may receive preferences, a quotation rate may also be combined with a local tariff *if the quotation is designed to be used in that manner.* * * *" [Emphasis supplied.]

The cited case can be clearly distinguished from the present case, since the court held the Government was not entitled to combine a Section 22 Quotation with a tariff rate in order to defeat the application of a single factor joint through-rate, which is not involved in the present case. It also appears, in the former cited case that when the carriers issuing those quotations intended to permit their use in combination with tariff rates, an express provision to this effect was inserted in the quotation.

Such a provision is absent from the Section 22 Quotation involved in the present case, nor is there any indication that the quotation was designed to be used in combination with a local tariff, as considered by the court in the earlier Great Northern case, supra.

Item 6 of the quotation in the present case provided in part:

> "Shipments made under this quotation are subject to all charges and all allowances * * * and to all other privileges, charges and *rules which in any way increase or decrease the amount to be paid on any shipment* or which increase or decrease the value of the service, without, in any case, any land-grant deduction. (T.C.F.B. Section 22 Quotation No. 13–A, p. 2, Def's. Exh. 5.)" [Emphasis added.]

Rule 14–C of the Interstate Commerce Commission's Tariff's Circular 20 restricting combination rates to filed rates does not, by itself, apply to an unregulated Section 22 Quotation. However, Item 6 of the No. 13–A quotation refers to all rules "which in any way increase or decrease the amount to be paid on any shipment." The Commissioner's ruling

has this effect, and must be considered as being incorporated within the Section 22 Quotation No. 13–A.

We conclude that, except for that part of the counterclaim conceded by plaintiff, defendant's counterclaim should be dismissed.

Judgment will be entered for plaintiff in the sum of $24,474.90 less the sum of $4,240.33 due defendant on its counterclaim; the net amount of this judgment for plaintiff to be $20,234.57.

JONES, Chief Judge, and DAVIS, LARAMORE and WHITAKER, JJ., concur.