The **PENNSYLVANIA RAILROAD COM-
PANY**, Plaintiff,

v.

**MOORE–McCORMACK LINES, INC.,**
Defendant.

United States District Court
S. D. New York.

Oct. 4, 1965.

Conboy, Hewitt, O'Brien & Boardman, New York City, for plaintiff (R. L. Duff, New York City, of counsel).

Browne, Hyde & Dickerson, New York City, for defendant.

RYAN, Chief Judge.

Plaintiff railroad moves for summary judgment to recover demurrage under a tariff filed with the Interstate Commerce Commission. Jurisdiction is based on Sec. 1 et seq., 49 U.S.C.A., and Sec. 1337, 28 U.S.C.A.

The essential facts are undisputed. Defendant has attempted to raise five issues, but one is a factual one which we find can be determined on the record.

The claim in suit is brought by plaintiff as a railroad carrier to recover demurrage for defendant consignee's failure to release plaintiff's equipment consisting of three lighters. The only question is whether plaintiff is barred from recovering demurrage because it was unable to discharge the lighters by reason of a strike against defendant. It is conceded by plaintiff that under the published tariff it had the obligation of discharging the lighters.

The tariff known as "Lighterage and Terminal Regulations in New York Harbor and Vicinity", Freight Tariff 116–G, I.C.C. A–1108, effective August 23, 1956, is relied on by plaintiff as the tariff governing the terms and conditions of lighterage delivery of freight by it to defendant. Although admitting the execution of a demurrage agreement under the tariff, defendant has refused to concede its applicability and has pleaded this as a question of law. In its affirmative defenses, however, defendant has relied on this tariff to bar plaintiff's claim, and its entire legal argument has centered on an interpretation of the tariff's regulations. It has cited no other tariff or agreement. We find, therefore, that the above cited tariff determines the rights of the parties. All references are to it.

It is defendant's argument that any delay in discharging the lighters was the result of plaintiff's failure to comply with these regulations.[1]

There is no dispute that, on May 16 and 17, 1962, three of plaintiff's lighters, Nos. 490, 443 and 233, loaded with freight for export shipment on defendant's vessels, reported to a pier owned by defendant located at 23rd Street, New York. On May 16, 1962 defendant's seagoing employees represented by the S.I.U. commenced a strike against defendant's vessels only—not against others in the shipping industry. While the strike was in progress, the employees (longshoremen) of defendant's stevedore, John W. McGrath Corp., represented by the I.L.A., refused to cross the picket line; none of defendant's vessels were loaded and plaintiff's lighters remained alongside the pier unloaded until the strike ended, at which time plaintiff unloaded and accepted delivery of the cargo held therein. It is conceded by plaintiff that the employees (shenangoes) of its stevedore, Wm. Spencer & Sons Corp., did not cross the picket line so long as defendant's stevedore employees did not.

Although the long haul rate prescribed by the tariff and paid by the defendant to plaintiff included the unloading of the lighters by the plaintiff, the actual act of unloading was a joint

---

1. The duty of the carrier to unload the freight is prescribed in Rule A–10e, Item 2525: "On * * * export * * * traffic * * * rates to or from New York, including free lighterage on articles entitled to free lighterage, will include * * * unloading of lighters * * * at place of * * * delivery by these companies * * *."

operation. Spencer's shenangoes would lift the cargo from the plaintiff's lighters and deposit it on the pier—no more than 100 feet from the lighter—where it was received by McGrath's checkers, inspected for damage and amount, checked against the shipping documents and receipted, and then was taken away by the McGrath longshoremen for loading on the vessel or to make more space on the pier.[2]

The sole question of fact attempted to be raised by defendant is whether in spite of the refusal of McGrath's longshoremen to cross the picket line, there were enough employees of defendant or supervisory personnel of McGrath, or both, to accept delivery of the cargo had plaintiff unloaded it. Defendant has submitted absolutely no evidence to support any finding or inference that there were. There is no affidavit from any officer or employee stating that there were any employees capable of accepting delivery of the cargo in spite of the fact that, if there were, defendant or its stevedore would have personal knowledge of this. The bare statement is made in the brief submitted in opposition to this motion that "supervisory personnel of John W. McGrath Corporation were on the pier throughout the strike." We assume that they were, but this is not to say that they could, would or were able to receive delivery from plaintiff and perform the customary services of the longshoremen and checkers. In fact McGrath's testimony, through its Superintendent, was that this type of personnel could not physically have done longshoremen's work nor would they have been permitted to do it, that during the strike no loading or unloading was done save for one instance when defendant gave McGrath special permission to have its men go on the pier to discharge perishable and frozen cargo. Although

the witness testified that he believed some longshoremen were on the pier during the strike, he was unable to substantiate this fact or to show by any records their number or what work, if any, they did, even though such records had been subpoenaed by plaintiff in connection with the deposition and no such records have been exhibited to the Court or to counsel for plaintiff. As to the presence of defendant's personnel on the pier. (Defendant's Rule 9–G Statement 2(b)), it is its sworn statement that all its stevedoring operations, including inspection, receipting and accepting delivery, were contracted to McGrath, and there is no evidence that its personnel could or would have done longshoremen's work. Considering its labor problems, it is most unlikely that defendant would have permitted its supervisory employees to perform union work. A letter from defendant's vice president to plaintiff states that during this period "the papers were not accepted" (the shipping documents presumably); and the letters from its Traffic Manager read that "inasmuch as this strike was beyond our control, we are not responsible for demurrage charges", and "there being no personnel at the pier, the boat's papers were not accepted, nor was the railroad capable of unloading the cargo to the pier. * * *" The evidence firmly supports the finding that there were no stevedoring services available at the pier to receive the cargo from plaintiff, had it attempted to discharge it, and that neither defendant consignee nor plaintiff carrier were able to carry out its agreed part in the unloading. Both were in default, and the question is one of causation—whose default was responsible for the delay in releasing the lighters.

Defendant argues that, in spite of the strike and its inability to receive the cargo, plaintiff was under an abso-

---

2. Rule A–165(a). Item 4410, prescribes the limitation on how lighterage will be performed. It . states that freight "* * * interchanged with Steamship Lines at steamship piers will be delivered * * * by the carrier at a distance of not over 100 feet from the gang-way of its barge, lighter or scow, and in no case will the carrier deliver freight to or receive freight at the second floor or loft of steamship piers, or the deck or hold of a vessel; nor shall the carrier be required to tier, pile or assort freight at place of * * * delivery."

lute duty to discharge the lighters before it could charge demurrage for delay in their return, because the long haul rate prescribed by the tariff and paid by defendant included unloading. Plaintiff answers that, since its failure to discharge was not the result of any act on its part but rather the result of the strike on defendant's pier, irrespective of whether defendant had any control over it, demurrage accrued as a matter of law under the tariff regulations.

There was no duty on plaintiff, even had it been able to obtain shenangoes to do the work, to discharge the cargo on the pier without having defendant's permission to do so and without having it checked and receipted for on discharge. The pier was defendant's own pier and such a discharge would have completed delivery to defendant, surrender of possession by plaintiff and loss of any lien for charges without a satisfactory receipt. Plaintiff's duty to unload was limited and conditioned on permission and prior arrangements with defendant by Rule A–10(a), Item 2510 of the tariff, which provides that:

"Lighterage of frieght to or from private piers or landings can only be done when shippers or consignees arrange with the owners or occupants of such piers or landings for the use thereof."

We agree with plaintiff that its duty to unload would not arise until defendant had signified its readiness to receive and was in fact ready to do so in the customary fashion, which we have found it was not during the period in question.

Under Subdivision e of Rule A–10, in the absence of any fault for the delay on plaintiff's part, demurrage accrued for it is provided that:

"In case of delay for want of room in which to deliver freight under the provisions of paragraphs (a), (b), (c) and (d), demurrage under the provisions of Rule A–170, shall accrue the same as if the consignee or vessel were not ready to receive."

■■ We have seen that free lighterage and unloading applied to export traffic, and it is clear from the reference above to a vessel that the carrier's right to demurrage in case of delay or inability to receive applies to export traffic. No distinction is drawn between a right to demurrage where the carrier bears the expense of unloading and where the consignee does, as in domestic traffic. Although demurrage rates are collectible togther with the line haul freight charges, they are two separate items—each has a separate rate and serves a different purpose. Great Northern Ry. Co. v. United States, Ct.Cl., 312 F.2d 906.

■ It is immaterial that defendant's inability to receive, which relieved plaintiff of its duty under the rate to unload before demurrage charges could accrue, was not of its making. Demurrage is not concerned with culpable or wilful delay—but only with delay which it penalizes in order to insure the prompt release of a carrier's equipment. Obviously, if the failure to release is brought about through the carrier's default, demurrage would not accrue to it. This is not the case here (The Hans Maersk, 266 F. 806, 808–809 (2 Cir. 1920); Commerce Indus. Ass'n of N. Y. v. B. & O. R. R. Co., 281 ICC 655; Meier & Pohlmann Fur. Co. v. Gibbons, 8 Cir., 233 F. 2d 296).

■ Defendant had admitted that the strike was not a general one against the shipping industry but a local one against its vessels. Assuming that it was brought about through no fault of defendant and that defendant had no control over its happening, it is not such vis major as would in law excuse it from paying demurrage. (Sinclair Refining Co. v. Schaff, 10 Cir., 275 F. 769; National Cooperage & Woodenware Co. v. Alton & Southern R. R. Co., 241 ICC 183; but Cf. Balfour, Guthrie & Co. v. Chicago, St. Paul, etc., 235 ICC 437)

■ Under Rule A–170, Item 4420, the plaintiff had the option to unload and remove defendant's cargo to a warehouse at defendant's expense. This is an op-

tion for its benefit; it was under no duty to do so.

The answer to defendant's final argument that the rates for demurrage should not exceed the value of the loss of the equipment is found in the Demurrage Agreement which it executed as part of the tariff duly filed by the Commission. Although it is recognized that demurrage is computed to include two elements—compensation for use of the equipment and a penalty designed to prevent undue detention—recovery here may not be limited to the value of the actual loss of use of the equipment. The tariff provides otherwise. The filed tariff has the weight of law; it may not be altered or modified by the parties or the Court.

The demurrage sought by plaintiff is in the amount of $4,538.50 and the computation is found in the affidavit of plaintiff's Agent. Its accuracy is not disputed by defendant.

The motion is granted. The Clerk is directed to enter judgment in favor of plaintiff for $4,538.50 with interest as demanded in paragraphs "12" and "16" of the complaint, together with taxable costs and disbursements.