## SEABOARD COAST LINE RAILROAD COMPANY

v.

## The UNITED STATES.

### No. 415–65.

United States Court of Claims.

July 16, 1969.

James E. Williams, Jacksonville, Fla., for plaintiff, Lawrence Cake, Washington, D. C., of counsel.

John Charles Ranney, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57 (a). The commissioner has done so in an opinion and report filed on November 27, 1968. Defendant has filed exceptions to the commissioner's opinion, findings of fact and recommended conclusion of law and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $129,267.17.

BERNHARDT, Commissioner:

The plaintiff railroad [1] sues to recover additional sums due it for rail transportation of troops and military impedimenta [2] from Fort Hood, Texas, to Fort Stewart, Georgia, in October 1962.

During the military emergency of the so-called Cuban Missile Crisis in late October 1962 it became imperative to move large elements of the First Armored Division, together with their equipment, from Fort Hood to Fort Stewart. Time was of the essence for, as history now records, the United States faced the sudden prospect of having to invade Cuba to compel the removal of hostile missiles emplaced there which threatened this country's security.

The Commanding Officer of the First Armored Division furnished the Military Traffic Management and Terminal Service (MTMTS) his logistical requirements for freight and passenger cars to accomplish the move. MTMTS passed the request on to the Western Military Bureau, an agency of the railroads serving that area. The Bureau, aided by the Association of American Railroads, located the necessary rolling stock and suggested a routing. MTMTS relayed this information to the First Armored Division, whose local transportation officer prepared bills of lading to cover the move. The bills of lading specified the routing suggested by the Bureau. Way-bill copies of the bills of lading were issued to the railroads, and the troops and their impedimenta were shipped accordingly.

Four of the 14 shipments involved in the move constitute the subject matter of the present suit. Whereas ten of the 14 shipments moved over routes for which the Government was charged a joint single factor through rate,[3] the four shipments in issue moved over different routes for which the Government paid a higher combination through rate.[4] Later the Government recouped the excess from other bills due the carrier, contending that all shipments should have been routed and charged at the lower rate. The ostensible reason why they were not so routed was that the cheaper routes were congested at the time by the ten other shipments.[5] Military exigencies required that the impedimenta accompany the troops so they should arrive together at destination, ready for instant deployment.

The rail needs of the nation are served by various railroads which own and operate a network of interconnecting rail lines, as well as freight and passenger cars and supporting service installations. A shipment moving from one geographical point to another will commonly use connecting segments of rail lines owned by different railroads. Charges for the use of these lines and equipment are

1. By order of August 9, 1967, the Seaboard Coast Line Railroad Company was substituted as party plaintiff in lieu of Atlantic Coast Line Railroad Company, the plaintiff on the petition, after the Interstate Commerce Commission allowed a merger between the Atlantic Coast Line Railroad Company and the Seaboard Air Line Railroad Company into a new corporation known as Seaboard Coast Line Railroad Company, which latter company took over all property interests and obligations of the merged companies.

2. Joint Military Passenger Agreement No. 30, issued by the railroads to the Government under Section 22 of the Interstate Commerce Act, defines military impedimenta to be "camp equipage, subsistence stores, medical stores, emergency ammunition, or other property of the military agencies generally known as impedimenta, but not including live stock, nor personal baggage."

3. A rate published as a unit applicable from a point located on one transportation line to a point located on another transportation line, made by agreement or arrangement between, and published in a single tariff under proper concurrence of all transportation lines over which the rate applies. See Great Northern Ry. Co. v. United States, 312 F.2d 906, 160 Ct. Cl. 225, 236 (1963).

4. A joint rate which is obtained by combining two or more factors published in the same tariff. See *Great Northern* case cited in fn. 3.

5. So stated by defense counsel at trial.

fixed by an elaborate system of tariff agreements among the railroads which are approved by the Interstate Commerce Commission. Charges depend principally on the nature of the commodities and their routing. The terminology employed in the industry as a shorthand method of referring to particular rate situations is often very confusing.

The Department of Defense, because it is a large user of rail transportation facilities for the movement of military personnel, entered into Joint Military Passenger Agreement No. 30 (hereafter JMPA–30) with rail carriers serving certain areas, including the areas involved in this proceeding. The purposes of the Agreement are stated in its preamble which, in paraphrase, are to provide a mode of passenger transportation service meeting military requirements which complies with national transportation policies set by Congress, as to satisfactory service, fares and allowances, accounting procedures, and equitable distribution of traffic among the common carriers.

Section 22 of JMPA–30 provides for the problem of military impedimenta accompanying the transportation of troops. Its relevant provisions are quoted in finding 9, *infra*. Generally, Section 22 describes the conditions under which impedimenta will be transported. We are particularly concerned with the provision regarding mixed passenger-freight train service. The sole issue in this case concerns charges for freight transportation, as opposed to passengers. Section 22(b) gives jurisdiction over freight transportation to the carriers. Section 22(c) incorporates the freight classifications of impedimenta contained in the Consolidated Freight Classification.

Section 23 of JMPA–30, quoted in finding 10, *infra*, provides for routing of traffic. The immediately vital provision of Section 23(a) is that which authorizes the carrier to submit "routing suggestions" to the military agencies designed to meet requirements. Because of their importance to the present controversy,

paragraphs (b) and (d) of Section 23 are quoted in full:

(b) In any case in which the military representatives consider a route submitted by the representatives of the carriers as unduly circuitous (in terms of elapsed time) or as a route which does not provide the service the military representatives require, or a route not consistent with military transportation policy with respect to equitable distribution of traffic or otherwise, the representatives of the carriers should be given an opportunity to submit alternate routings which will meet the requirements of the military representatives. The military representatives in such case reserve the right to require the use of any available alternate route via which movement can be accepted by the individual carrier or carriers concerned. If routings cannot be obtained promptly in a particular case and rail transportation is to be utilized, routing will be made by the military officers concerned in cooperation with the authorized local railroad representative.

\*　　\*　　\*　　\*　　\*　　\*

(d) The administrative officers of the military agencies parties to this agreement reserve the right to reject any routings submitted by the representatives of the carriers and require the carriers to furnish transportation via a route designated by them in cases in which military necessity precludes the use of the route or altenate routes which may be submitted by the representatives of the carriers.

The precise issue framed by the facts and relevant regulations is whether the Government is entitled to the cheaper joint single factor through rate for the four shipments in dispute where the carrier suggested a routing which admittedly required the imposition of a more costly combination through rate and the military did not reject the suggested routing, assuming higher cost to be one of the reasons for which the military enjoyed the right of rejection of a routing suggested by the carrier.

The Government misinterprets Section 23(b) of JMPA–30 to permit the military authorities to reject a routing suggested by the carrier only where it is unduly circuitous, or does not provide the required service, or is not consistent with military transportation policy with respect to equitable distribution of traffic, without attaching any significance to the "or otherwise" language at the end of the recitation of the grounds for rejection. The "or otherwise" modifies the third ground, and in the case under consideration it would have authorized the military authorities to reject the suggested routing on cost considerations, for cost is one of the essential factors involved in effectuating the military transportation policy. Whether or not it knew at the time that the routing suggested by the carrier was not the least costly mode of transportation, the responsible military authorities were charged with that knowledge, and having failed to reject the suggested routing they are bound to pay for it.

Alternately, the Government contends that the shipments were tendered to the carrier "unrouted" in effect, whereupon it became the carrier's duty to select the cheapest route. In the normal case it is the shipper's duty to designate the routing and the carrier's duty to follow instructions. In the absence of instructions by the shipper it is ordinarily the duty of the carrier to move a shipment by the cheapest available route that is consistent with the rights of the parties and the general public, and is not unreasonable. This rule is not absolute. There are circumstances which would justify the more expensive route, such as when it conforms to the carrier's usual and regular practice. Northern Pacific Ry. Co. v. Solum, 247 U.S. 477, 482, 38 S.Ct. 550, 62 L.Ed. 1221 (1918); Missouri Pacific R. R. Co. v. Stroud, 267 U.S. 404, 406, 408, 45 S.Ct. 243, 69 L.Ed. 683 (1925). In Hewitt-Robins, Inc. v. Eastern Freight-Ways, Inc., 371 U.S. 84, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962), a Motor Carrier Act case, a comparable problem led the court to state the sole issue to be " * * * whether the carrier routed the shipment over the cheapest available route, or made a showing of adequate justification for not doing so. * * *." Under this theory, even if the plaintiff could be charged with prescribing the routing of the shipments in issue because of its role in suggesting the route to the military authorities, there would have been ample justification for the choice under the circumstances which existed. The military could brook no delay and the alternate route charging the cheaper joint single factor through rate serving the points of origin and destination were congested by other military traffic generated by the same crisis, and hence were not available from a practical point of view. The duty of an uninstructed carrier to ship by the cheaper of two routes is not violated where the less expensive of the two routes is temporarily in use and not available to meet the shipper's requirements.

The plaintiff is entitled to judgment on its claim.