**IMPERIAL VAN LINES INTERNATIONAL, INC.**

v.

**The UNITED STATES.**

**No. 324–84C.**

United States Claims Court.

Nov. 12, 1985.

· Alan F. Wohlstetter, Washington, D.C., for plaintiff. Stanley I. Goldman and Denning & Wohlstetter, of counsel.

M. Susan Burnett, with whom were Acting Asst. Atty. Gen. Richard K. Willard and David M. Cohen, Washington, D.C., for defendant. Eldon Lewis, Gen. Services Admin., James E. Armstrong, Dept. of the Army, and George L. Richardson, Military Traffic Management Command, of counsel.

## ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

WHITE, Senior Judge.

The plaintiff, Imperial Van Lines International, Inc. ("Imperial"), sues for additional compensation in connection with shipments of household goods and unaccompanied baggage which Imperial moved for the Department of Defense from points overseas to points in the Continental United States ("CONUS").

The case comes before the court at this time on the plaintiff's motion for summary judgment, supplemented by the parties' briefs and oral arguments.

It should be mentioned at the outset that, under RUSCC 56, this court can grant a motion for summary judgment if—and only if—the papers submitted to the court show that there is no genuine issue as to any material fact in the case, and that the moving party is entitled to judgment as a matter of law.

### Background Information

Imperial, a California corporation, is a freight forwarder. As such, at all times relevant to this case, Imperial participated in the International Through Government Bill of Lading ("ITGBL") program of the Military Traffic Management Command ("MTMC") for the transportation of household goods and unaccompanied baggage for the Department of Defense between points in CONUS and points overseas, and between points overseas.

Under the ITGBL procurement method, a shipment of household goods or unaccompanied baggage belonging to military (or other) personnel of the Defense Department is tendered to a freight forwarder for movement from origin to destination under the forwarder's responsibility as a common carrier. Thus, as between the Defense Department and the forwarder, the former is the shipper and the latter is the carrier. The forwarder packs the shipment in a

specially designed container, selects the underlying carrier or carriers to be used, including an ocean carrier in most instances, and establishes the routing of the shipment from origin to destination. The forwarder's relationship to an underlying ocean carrier is that of a shipper; and, as such, the forwarder purchases transportation service from the ocean carrier and pays the ocean carrier's tariff rates.

MTMC regularly solicits freight forwarders, including Imperial, to submit rates applicable to ITGBL shipments of household goods and unaccompanied baggage belonging to military personnel and their dependents. Rates are normally solicited for 6-month procurement periods, known as "Volumes." Rates submitted by forwarders are single-factor rates which offer MTMC a rate applicable to the through transportation movement of shipments from point of origin to point of destination. These single-factor rates are based, *inter alia*, upon underlying ocean transportation rates in effect on a date established for each Volume period by MTMC, known as the "pegged quotation date."

If, during a particular Volume period, the ocean transportation cost to forwarders of a particular type of service in an ocean channel increases by 2.5 percent or more after the pegged quotation date for such period, and the service is no longer available in that ocean channel at the former ocean rate level, a forwarder utilizing the service in such channel is entitled, upon application, to obtain from MTMC an ocean rate adjustment upward to cover the additional cost of the ocean transportation.

Two of the four shipments involved in this case moved during the Volume 45 period, and two shipments moved during the Volume 46 period. Volume 45 covered shipments tendered during the period beginning October 1, 1982, and extending through March 31, 1983. Volume 46 originally covered shipments tendered during the period beginning April 1, 1983 and extending through September 30, 1983, but the period was subsequently extended through October 31, 1983. One of the ship-

ments during the Volume 45 period was a Code 4 shipment involving household goods, and the other was a Code 7 shipment involving unaccompanied baggage. Both of the shipments during the Volume 46 period were Code 4 shipments involving household goods. All four shipments originated in Germany and all were destined for points in CONUS. Each shipment was in a single container.

For both the Volume 45 and the Volume 46 periods, Imperial had quoted to MTMC, pursuant to the latter's solicitations, single-factor rates on the movement of Code 4 and Code 7 shipments between various overseas points and CONUS, including rates on the movement of such shipments (1) between points in Germany and points in CONUS, and (2) between points in England or Scotland and points in CONUS. These rates were based (*inter alia*)upon the cost to Imperial of ocean transportation for single-container shipments in effect on the respective pegged quotation dates for the Volume 45 and the Volume 46 periods.

Pursuant to a request submitted by Imperial, MTMC authorized upward ocean rate adjustments for Code 4 and Code 7 single-container shipments during the Volume 45 period from England or Scotland to CONUS (East Coast ports only), the Code 4 adjustment being in the amount of $31.22 per net cwt., and the Code 7 adjustment being in the amount of $17.44 per gross cwt.

Also, pursuant to a request submitted by Imperial, MTMC authorized upward ocean rate adjustments on Code 4 and Code 7 single-container shipments during the Volume 46 period from England or Scotland to CONUS (Gulf ports only), the Code 4 adjustment being in the amount of $13.40 per net cwt., and the Code 7 adjustment being in the amount of $8.18 per gross cwt.

The adjustments upward referred to the two immediately preceding paragraphs were based upon increases in the tariffs of ocean carriers for single-container shipments moving from England or Scotland to CONUS.

As stated previously, each of the four shipments involved in this case was in a single container; and they were all tendered to Imperial at points in Germany for movement to points in CONUS. Instead of routing each shipment from Germany to CONUS, Imperial routed the shipment to England and loaded it aboard a vessel of the American Coastal Line that was bound for Felixstowe, England. There, the particular container was off-loaded and combined with other containers originating at different points. The resulting multiple-container shipment was then routed to CONUS and put aboard the same vessel previously mentioned, for movement to CONUS under a multi-container ocean tariff of the American Coastal Line, which was cheaper than the single-container ocean tariff from England to CONUS.

For the transportation services rendered by Imperial in connection with the four shipments involved in this case, Imperial included, as factors in computing its charges, the upward ocean rate adjustments previously authorized by MTMC in connection with single-container shipments moving from England or Scotland to CONUS—*i.e.*, the Code 4 adjustments of $31.22 and $13.40 per net cwt. for the Volume 45 and Volume 46 periods, respectively, and the Code 7 adjustment of $17.44 per gross cwt. for the Volume 45 period.

The General Services Administration, however, denied Imperial's claimed entitlement to the upward ocean rate adjustments applicable to single-container shipments moving from England or Scotland to CONUS. Instead, GSA paid Imperial on the basis of the lower rates which Imperial had quoted to MTMC on single-container shipments routed from Germany to CONUS.

As a result, GSA refused to pay $1,608.77 of Imperial's total charge for the Code 4 shipment during the Volume 45 period, $124.87 of the plaintiff's total charge for the Code 7 shipment during the Volume 45 period, $86.56 of the plaintiff's total charge for one Code 4 shipment during the Volume 46 period, and $426.66 of the plaintiff's total charge for the other

Code 4 shipment during the Volume 46 period.

For the transportation services rendered by Imperial in connection with the four shipments involved in this case, Imperial seeks additional compensation in the respective amounts referred to in the preceding paragraph.

The parties have agreed that, if the plaintiff is entitled to recover, judgment should be entered for the plaintiff in the amount of $2,246.86.

### Discussion

■ It is basic in transportation law that, ordinarily, a carrier is under a legal obligation to move a shipment over the cheapest available route. *See Northern Pacific Railway Co. v. Solum,* 247 U.S. 477, 482, 38 S.Ct. 550, 552, 62 L.Ed. 1221 (1918); *Seaboard Coastline Railroad Co. v. United States,* 188 Ct.Cl. 968, 974, 412 F.2d 1274, 1277 (1969). This obligation is not absolute, as there are exceptional situations which relieve the carrier of the obligation—*e.g.,* where the shipper directs the carrier to utilize a more expensive routing (*see Trans Ocean Van Service v. United States,* 192 Ct.Cl. 75, 110–11, 426 F.2d 329, 347–49 (1970); *Seaboard Coastline Railroad Co. v. United States, supra,* 188 Ct.Cl. at 974, 412 F.2d at 1277), or where, under the existing circumstances, it would be unreasonable for the carrier to move the shipment over the cheapest available routing (*see Northern Pacific Railway Co. v. Solum, supra,* 247 U.S. at 482, 38 S.Ct. at 552; *Seaboard Coastline Railroad Co. v. United States, supra,* 188 Ct.Cl. at 974, 412 F.2d at 1277).

■ The present record before the court, however, does not contain any sort of showing that the Defense Department instructed Imperial to route these shipments first to England, to off-load them in England, and thereafter to route them from England to CONUS, or that exceptional circumstances existed which justified Imperial in selecting such a routing, thereby increasing Imperial's charges, and the

Government's costs, over what they would have been if Imperial had routed the shipments from Germany to CONUS under Imperial's quoted rates for such traffic.

■ Actually, it seems to be a reasonable inference from the record before the court that the only reasons why Imperial routed each of these shipments to Felixstowe, off-loaded it there, and then routed the shipment (aboard the same vessel) from England to CONUS, were: (1) to permit Imperial to combine the container with other containers at Felixstowe and thus take advantage of the lower ocean transportation rate that was available from England to CONUS on multiple-container shipments; and (2) to attempt to establish a predicate for claiming the benefit of the upward ocean rate adjustments authorized by MTMC on single-container shipments from England or Scotland to CONUS. It was not permissible for Imperial to accomplish these objectives when the result was to increase the Government's transportation costs, thereby depriving the Government of its right to have the four shipments routed at Imperial's cheaper rates from Germany to CONUS.

■ Imperial relies on certain Standing Instructions issued by MTMC to freight forwarders, particularly one such instruction which declared in part that "Code 4 and 7 shipments between CONUS and overseas rate areas will be open routing; however, carriers are required to meet performance standards irrespective of routing actually used." Imperial contends, in effect, that this instruction gave it *carte blanche* to utilize any available routing, without considering the cost to the Defense Department, so long as performance standards were met.

As applied to the present case, the instruction quoted in the preceding paragraph would be applicable to the routing of Code 4 and Code 7 shipments between CONUS and the overseas rate area of Germany, as that was the service purchased by the Defense Department for these shipments. Actually, the defendant has not interposed any objection to Imperial's choice of a routing aboard a vessel which, en route from Germany to CONUS, touched at the English port of Felixstowe to take on additional cargo. Rather, it was Imperial's action in first routing each container involved in this case from Germany to England, off-loading it at Felixstowe, and then routing it to CONUS in an attempt to convert the shipment into one between England and CONUS, thereby substantially increasing the Defense Department's cost, which the Defense Department has objected to and which the court holds was not permissible.

Accordingly, it would be necessary to hold, on the basis of the present record, that Imperial was under a legal obligation to move the shipments over the cheapest routing that was available and reasonable—*i.e.*, from Germany to CONUS, utilizing Imperial's quoted rates for such traffic.

■ Moreover, it should be noted that MTMC had authorized upward ocean rate adjustments on single-container shipments moving from England or Scotland to CONUS because the ocean transportation costs on single-container shipments in that ocean channel had increased more than 2.5 percent. In the present case, Imperial moved these shipments from England to CONUS at multiple-container—and not at single-container—ocean rates. There is no showing in the record that the cost of moving multiple-container shipments from England to CONUS had increased by the 2.5 (or greater) percent that was a prerequisite for obtaining an upward ocean rate adjustment. This is another reason for holding that, on the present record, Imperial has not established its entitlement to the benefit of an upward ocean rate adjustment.

### Conclusion

For the reasons previously stated, it is concluded that the record before the court fails to show that the plaintiff is entitled to a judgment as a matter of law.

The plaintiff's motion for summary judgment is therefore denied.

IT IS SO ORDERED.

**150**

*Agreed Facts*

1. The plaintiff, Imperial Van Lines International, Inc. (usually referred to hereafter in the findings as "Imperial"), is a California corporation, with its principal place of business at Torrance, California.

2. At all times relevant hereto, Imperial operated as a freight forwarder of used household goods and unaccompanied baggage pursuant to Permit No. FF–324, issued by the Interstate Commerce Commission, and as a non-vessel operating common carrier by water subject to the jurisdiction of the Federal Maritime Commission. In these capacities, Imperial participated in the International Through Government Bill of Lading ("ITGBL") program for the transportation of household goods and unaccompanied baggage for the Department of Defense to, from, and between overseas points. The ITGBL program is administered by the Military Traffic Management Command ("MTMC").

3. At all times relevant hereto, the defendant, the United States of America, acted through the Secretary of Defense and his officers and employees, including officers and employees of MTMC, and the General Services Administration ("GSA") and its officers and employees.

4. The terms and conditions for the procurement of transportation of household goods and unaccompanied baggage for the Department of Defense by the ITGBL method are established by MTMC, in its regulations, including its Standing ITGBL Rate Filing Instructions and Procedures (the "Standing Instructions") and are incorporated into separate contracts in the form of Government Bills of Lading ("GBL's") awarded by individual military installations for the transportation of separate shipments of used household goods or unaccompanied baggage.

5. In the ITGBL procurement method, shipments of household goods or unaccompanied baggage are tendered to the freight forwarder for movement from origin to destination under the forwarder's responsibility as a common carrier. The forwarder packs the shipments in specially designed containers, selects the underlying carriers to be used, including ocean carriers, and establishes the routing of the shipments from origin to destination. The forwarder's relationship to the underlying carrier is that of a shipper, and; as such, the forwarder purchases transportation service from the ocean carrier and pays the ocean carrier's tariff rates.

6. MTMC regularly solicits freight forwarders, including Imperial, to submit rates applicable to ITGBL shipments of household goods and unaccompanied baggage belonging to military personnel and their dependents. Rates are normally solicited for 6-month procurement periods known as "Volumes." Rates submitted by forwarders, including Imperial, are single-factor rates which offer MTMC a rate applicable to the through transportation movement from point of origin to point of destination. These single-factor rates are based, *inter alia,* upon underlying ocean transportation rates in effect on a date established for each volume by MTMC, known as the "pegged quotation date."

7. By letters dated April 5, 1982 and September 29, 1982, MTMC solicited rates for the procurements known as Volumes 45 and 46, respectively. Volume 45 covered shipments tendered during the period October 1, 1982 through March 31, 1983. Volume 46 originally covered shipments tendered during the period from April 1, 1983 through September 30, 1983, but was subsequently extended through October 31, 1983. These solicitation letters incorporated by reference MTMC's Standing Instructions, which were required to be used in conjunction with these solicitations.

8. The Standing Instructions applicable to Volumes 45 and 46 specifically granted forwarders the right to route Code 4 household goods and Code 7 unaccompanied baggage shipments, stating in pertinent part:

(4) Code 4 and 7 shipments between CONUS and overseas rate areas will be open routing; however, carriers are required to meet performance standards irrespective of routing actually used. In

this respect, carriers are cautioned to avoid routings through ports which historically become "congested during peak shipping months with the resultant frustration of DOD shipments * * *."

9. On July 29, 1982, the Director of Personal Property of MTMC issued a message which set forth MTMC's policy that encouraged forwarders to use routings and underlying carriers which provide viable service at the lowest overall cost, as known at the time of bid submission. He stated in pertinent part:

A. MTMC does not direct, encourage, nor advise any carrier to utilize any specific air-ocean rate.

\* \* \* \* \* \*

E. MTMC anticipates, but does not direct, that carriers will construct their single-factor rates based upon the legal applicable rates which provide the most economical, efficient and viable service best suited to the needs of their own operation.

F. MTMC requests carriers only to file rates which cover their known costs.

G. MTMC will continue to consider underlying transportation rate increases when justified for specific instances in accordance with the instructions contained in the current solicitation letter and the Standing ITGBL Rate Filing Instructions and Procedures of 18 May 1979, as amended.

10. The Standing Instructions applicable to these procurements provided criteria for ocean rate adjustments due to rate changes occurring after the pegged quotation date in underlying ocean transportation purchased by the forwarder, and stated that MTMC would "favorably consider" requests for rate adjustments which met the criteria and administrative requirements of the Standing Instructions, paragraphs 6000 and 6001. Pursuant to paragraph 6001c of the Standing Instructions, when an ocean rate adjustment is approved by MTMC, the adjustment is published in the Military Basic Tender ("MBT"), and establishes an added hundredweight charge which forwarders are authorized to bill be-

cause of an increase in ocean rates occurring after the pegged quotation date.

11. The criteria for obtaining authorization of an ocean rate adjustment were that the applicant-forwarder demonstrate that the ocean transportation cost involved in the routing utilized by the forwarder increased by not less than 2.5 percent after the pegged quotation date established by MTMC, and that no viable service remained in that ocean channel at the prior ocean rate level. In support of an ocean rate adjustment request, the applicant-forwarder was required to submit a narrative explanation of the adjustment and the underlying circumstances, a proposed MBT item, computations, copies of all relevant ocean carrier traffic pages, and a list of all U.S. Flag ocean carriers on the applicable trade route.

12. Requests for ocean rate adjustments were acted on by the Rate Acquisition Division, Directorate of Personal Property of MTMC, pursuant to the Standing Instructions. At all times relevant hereto, Colonel Tommy R. Mason was Chief of the Rate Acquisition Division, with direct responsibility for administering the ocean rate adjustment program. The ocean rate adjustment procedures were in effect since at least 1978 and were in effect during the entire time that Colonel Mason was Chief of the Rate Acquisition Division. The Standing Instructions, paragraph 6001a(5), required that an ocean rate adjustment request include "a proposed MBT and/or Manual Rate Tender item exactly as it should appear in the tenders."

13. On November 18, 1982, MTMC for the first time transmitted to the ITGBL industry approved ocean rate adjustment items with a changed wording which substituted the word "application" for "routing." MTMC did not advise industry of the purpose intended by its change in the wording of ocean rate adjustments.

14. The initial rate filing dates for Volumes 45 and 46 were May 26, 1982 and November 17, 1982, respectively. Since the initial rates for Volumes 45 and 46 had

already been filed prior to November 18, 1982, when MTMC made this change, Colonel Mason admitted that there was no way under MTMC's regulations for Imperial to reflect the impact of this change in MTMC's ocean rate adjustment procedure in its rates for Volumes 45 and 46.

15. Imperial requested ocean rate adjustments for Volume 45, Code 4 and Code 7, from England and Scotland to the Continental United States ("CONUS") (via East Coast ports) by letters dated November 18, 1982 and January 18, 1983, respectively. Imperial also requested ocean rate adjustments for Volume 46, Code 4 and Code 7, from England and Scotland to CONUS (via Gulf ports) by separate letters dated May 4, 1983.

16. Acting pursuant to its Standing Instructions, paragraph 6001, MTMC authorized the upward ocean rate adjustments for Volume 45, Code 4 and Code 7, requested by Imperial, based on increased charges for purchased underlying ocean transportation from England and Scotland to CONUS (East Coast ports only). The Code 4 adjustment of $31.22 per net cwt., effective during the period October 1, 1982 through May 31, 1983, was published as Item 430A of Supplement No. 13 of MBT No. 1–H, issued by the Household Goods Forwarders' Association of America, Inc. ("HHGFAA"), of which Imperial is a member. The Code 7 adjustment of $17.44 per gross cwt., effective October 1, 1982 through May 31, 1983, was published as Item 169 of Supplement No. 10 of MBT No. 2B, issued by the HHGFAA.

17. Acting pursuant to its Standing Instructions, paragraph 6001, MTMC authorized upward ocean rate adjustments for Volume 46, Code 4 and Code 7 single-factor rates, based on increased charges for purchased underlying ocean transportation from England and Scotland to CONUS (Gulf ports only). The Code 4 adjustment of $13.40 per net cwt., effective during the period May 6, 1983 through November 30, 1983, was published as Item 468 of Supplement No. 14 of MBT No. 1–H, issued by the HHGFAA. The Code 7 adjustment of

$8.18 per gross cwt., effective April 1, 1983 through November 30, 1983, was published as Item 187 of Supplement No. 11 of MBT No. 2–A, issued by the HHGFAA.

18. As a participant in the Volume 45 and Volume 46 procurements, Imperial forwarded certain Code 4 household goods shipments and Code 7 unaccompanied baggage shipments, which originated at points in Germany, and were destined for points in CONUS. Imperial routed these shipments to Felixstowe, England, for movement to CONUS under a multi-container ocean tariff of American Coastal Line. Volume 45 shipments moved pursuant to American Coastal Line Joint Venture Tariff No. FMC–4, page 540, which provided a reduced rate of $3,625 per container when 50 or more 40-foot standard containers were tendered at one time. The Volume 46 shipments moved pursuant to American Coastal Line Joint Venture, Inc. Intermodal Export/Import Tariff FMC No. 6, page 895. On April 1, 1983, the commencement of Volume 46, this tariff provided a reduced rate of $3,610 per container when 25 or more 40-foot standard containers were tendered at one time. On June 14, 1983, this rate was increased to $3,675 for the tender of five or more 40-foot containers.

19. (a) As pertinent to this action, Imperial forwarded the following shipments during Volumes 45 and 46 which originated at points in Germany and were destined for points in CONUS, and which Imperial routed to the Port of Felixstowe, England, for movement to CONUS under an applicable multi-container ocean tariff:

(1) Volume 45, Code 4 shipment—John T. Davis.

(2) Volume 45, Code 7 shipment—George Thorne.

(3) Volume 46, Code 4 shipment—Joseph M. Simpson.

(4) Volume 46, Code 4 shipment—Michelle Skaggs.

20. Pursuant to the Standing Instructions, paragraph 6001, Imperial billed for compensation of the ocean rate adjustment Item 430A for the David shipment, Item

169 for the Thorne shipment, and Item 468 for the Simpson and Skaggs shipments.

21. By Settlement Certificate dated June 19, 1984, GSA denied Imperial's claim for $124.87 under Item 169 for the Thorne shipment (GBL BP 569873); and by Settlement Certificate dated May 7, 1984, GSA denied Imperial's claim for $1,608.77 under Item 430A for the Davis shipment (GBL BP 574839). By separate Settlement Certificates dated April 18, 1984, GSA denied Imperial's claims under Item 468 for $86.56 for the Simpson shipment (GBL BP 089438), and $426.66 for the Skaggs shipment (GBL BP 62785).

22. The amount to which Imperial would be entitled, should the court find that Imperial was wrongfully denied the ocean rate adjustments, is $2,246.86.