## GRANGER et al. v. DAVIS.

(Circuit Court of Appeals, Sixth Circuit. December 8, 1924.)

No. 4040.

1. **Carriers ⬡100(1)—Yard held private yard of Hay and Grain Exchange, and not general railroad facility, within rules relating to demurrage.**

Yard in which congestion causing delay occurred *held* private yard of Hay and Grain Exchange, of which consignees were members, and not general railroad facility, within rules published in demurrage tariff, relating to demurrage where car has been consigned to "other than a public delivery track."

2. **Carriers ⬡100(1)—Yard leased by Hay and Grain Exchange for benefit of members was "other than public delivery track" within demurrage tariff.**

Railroad yard leased by Hay and Grain Exchange for benefit of its members, even though not strictly private, was "other than a public delivery track," within demurrage tariff.

3. **Carriers ⬡100(1)—Cars which yard of Hay and Grain Exchange could not hold held subject to demurrage, though not intended to be unloaded in plugging yard.**

Cars consigned to members of Hay and Grain Exchange, whose yards could not hold them, necessitating storage by railroad elsewhere, though not intended to be unloaded in plugging yard of consignee, *held* subject to demurrage, under demurrage tariff, as "cars held for or by consignors or consignees for loading, unloading, forwarding directions, or for any other purposes."

4. **Carriers ⬡100(1)—Demurrage rule held inapplicable to cars held out of plugging yard because of congestion.**

Rule published in demurrage tariff *held* applicable merely to cars actually placed in plugging yard and bulletined there, not those held out because of congestion at plugging yard.

5. **Carriers ⬡100(1)—Director General's action for demurrage accrued on cars moved in intrastate commerce held within jurisdiction of district court.**

Where demurrage accrued during federal control under tariff established by Director General, the District Court had jurisdiction, under Judicial Code, § 24 (Comp. St. § 991), in Director General's action to recover demurrage, though on cars moved in intrastate traffic.

6. **Carriers ⬡100(1)—Yards held "private yard" of Hay and Grain Exchange, and not general "railroad facility."**

Railroad yards leased by Hay and Grain Exchange for exclusive benefit of its members *held* "private yard" of such exchange and not general "railroad facility," though switching railroad collected inspection charge for privilege of partially unloading and examining, at such yard, cars consigned to them, and though members had agreed to accept notice of arrivals by bulletin.

7. **Carriers ⬡193—Delivering carrier may collect all charges from consignee, including those of its connections.**

Delivering carrier may collect all charges from consignees, including those of its connections.

8. **Carriers ⬡100(1)—Railroad could not recover demurrage for delay which could have been avoided if cars had been placed in strict order of arrival.**

Switching railroad serving Hay and Grain Exchange yard *held* not entitled to demurrage by reason of delay which could have been avoided by placing cars of different consignees in strict order of arrival, in view of rule published in demurrage tariff, providing for recovery of demurrage on basis of amount that would have accrued but for railroad's errors.

9. **Carriers ⬡100(1)—Constructive placement permissible only after physical tender of car or circumstances excusing it.**

Constructive placement *held* permissible only after physical tender of car or circumstances which excuse it, as inability to accept for causes attributed to consignee.

10. **Carriers ⬡100(1)—Rule as to recovery of demurrage where goods were reshipped to consignee's purchaser in same car after removal of portion for inspection, stated.**

Where cars were not loaded or unloaded, but enough contents were removed to reveal character, and carload was then sold on sample, its contents replaced, and car reshipped to purchaser, the free time for which consignee was not liable for demurrage *held* governed by rule published in demurrage tariff providing for free time where cars "are held" for consignment or reshipment in same car; the words "are held" meaning held either by consignors or consignees.

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; John W. Peck, Judge.

Action by James C. Davis, Director General of Railroads, as Agent operating the Pittsburgh, Cincinnati, Chicago & St. Louis Railroad Company, against Dan B. Granger and another. Judgment for plaintiff, and defendants bring error. Affirmed.

John C. Hermann, of Cincinnati, Ohio (Herbert Ritchie, of Cincinnati, Ohio, on the brief), for plaintiffs in error.

Gregor B. Moorman, of Cincinnati, Ohio (Maxwell & Ramsey, of Cincinnati, Ohio, on the brief), for defendant in error.

Before DENISON, MACK, and DONAHUE, Circuit Judges.

MACK, Circuit Judge. This action was brought by James C. Davis, Director General, as Agent operating the Pittsburgh, Cincinnati, Chicago & St. Louis Railroad Company, hereinafter designated as plaintiff, for certain demurrage charges accruing in January, February, April, and May, 1919, on cars of hay consigned to plaintiffs in error, hereinafter designated as defendants, under the uniform demurrage tariff, I. C. C. P. 1172. This tariff, duly filed, was applicable to both interstate and intrastate traffic. Judge PECK, to whom the case was submitted with waiver of jury, sustained the demurrage charges and rendered judgment therefor in the amount of $441.87, which the parties had stipulated was the amount due under Judge PECK'S rulings as to the law.

The 40 cars upon which the demurrage accrued were all consigned to defendants at the Hay and Grain Exchange tracks, known as their "plugging yard," at Front and Water streets, Cincinnati. These tracks, which had been used for general switching, were, by leases of 1917 and 1918, leased by the exchange from the Louisville & Nashville Railroad, which owned them. Members of the Exchange were alone permitted to use the tracks. Shortly after the execution of the first lease, defendants sent a notice to the Agent of the Pittsburgh, Cincinnati, Chicago & St. Louis Railroad, requesting that arrangements be made for bulletining at this plugging yard the arrival of "all cars of hay consigned to us and placed in this yard." The notice was pursuant to a rule which made consignee's agreement to accept such bulletining a condition thereto.

The large number of cars consigned to the members of the Cincinnati Hay and Grain Exchange resulted in an accumulation at one time of 532 cars, which the Hay and Grain Exchange refused to accept, except on the plugging tracks, although the capacity of these tracks was but 66 cars and the railroad offered to permit inspection on other tracks. When cars arrived, plaintiff issued constructive placement notices on such of them as the Hay and Grain Exchange members, including defendants, could not receive at their plugging yards and refused to accept elsewhere. On the cars for which there was room on the plugging tracks and which were delivered there, bulletins were posted in compliance with the request of the defendants and the other Hay Exchange members.

Of the entire number of cars that could not be placed on the Exchange plugging tracks, some had been brought to Cincinnati over the Baltimore & Ohio as the carrier line, others over the Big Four, as the carrier line, and still others by the plaintiff itself.

As to the cars brought to Cincinnati by the Baltimore & Ohio and Big Four, plaintiff was the switching line over whose tracks the cars had to be transferred for delivery to this plugging yard.

After the cars arrived on the Big Four and the Baltimore & Ohio, they notified the plaintiff, as the switching line, of such arrival. Since the plaintiff could not receive the cars from the Baltimore & Ohio and Big Four, because of the inability of defendants to accept the cars at their plugging yard, plaintiff, as the switching line, was compelled to pay $1 per day per car to the carrier line holding the car.

The demurrage was computed, according to the testimony, from the first 7 a. m. after bulletining as to those placed in the plugging yard. As to the cars held out, and these alone are involved in this case, demurrage was computed from the first 7 a. m. after giving the constructive placement order, pursuant to rule 5, section A, rule 3, section D, and rule 2, section B–2, but not rule 2, section B–4, or rule 2, section A, as published in the Demurrage Tariff, 1. C. C. P. 1172, all of which rules are quoted in the footnote.[1]

We concur entirely in the reasoning and conclusions of Judge PECK as formulated in his original and supplementary opinions appended hereto, and add thereto only a few additional reasons in support thereof.

[1] 1. There is evidence of some preliminary arrangement between plaintiff and the

---

[1] "Rule 5, Section A. When delivery of a car consigned or ordered to an industrial interchange track, or to other than a public delivery track, cannot be made on account of the inability of the consignee to receive it, or because of any other condition attributable to the consignee, such car will be held at destination, or if it cannot be reasonably accommodated there, at the nearest available hold point, and written notice that the car is held and that this railroad is unable to deliver, will be sent or given to the consignee. This will be considered constructive placement.

"Under this rule any railroad delay in making delivery shall not be computed against the consignee."

### Instructions and Explanations.

"Section A. This will apply to such cars as consignees located on switching line are unable to receive and which, for that reason, the switching line is unable to receive from carrier line. The carrier line will advise the switching line of point of shipment, car initals and number, contents and consignee, and if transferred in transit the initials and number of the original car; the switching line will notify consignee and put such cars under constructive placement."

"Rule 3, Section D. On cars to be delivered on any other than public delivery tracks, time will be computed from the first 7:00 a. m. after actual or constructive placement on such tracks.

"Rule 2, Section B. Twenty-four hours' (one day) free time will be allowed.

"2. When cars are held for reconsignment or reshipment in same car received."

"4. When cars are held in transit and placed for inspection or grading at stations where grain and hay must be inspected or graded, the consignee agreeing with the carrier in writing for file at the station to accept the bulletining of the cars as due and adequate notice of arrival, the bulletins must be posted by 9:00 a. m. of each day, showing the previous twenty-four (24) hours' receipts and the free time (24 hours) is to be calculated from the first 7:00 a. m. thereafter. Where there is no agreement for bulletining of cars the free time must be calculated from the first 7:00 a. m. after the day on which notice of arrival is sent or given to the consignee."

"Rule 2, Section A. Forty-eight hours' (two days) free time will be allowed for loading or unloading on all commodities."

Exchange before the leases were made. No claim is made that this arrangement contemplated a lease of the yard to the plaintiff for station purposes, for in that event the Exchange could not legally have retained exclusive rights therein. Furthermore, an agreement that as to members of the Exchange only, but not as to the public generally, the Exchange's own yards would be deemed a public station, would have involved an unlawful discrimination. But the evidence in respect thereto is contradictory; the trial judge was therefore in any event justified in disregarding defendants' version of the arrangement.

Finally, in our judgment, the leases to the Exchange and the absence of any lease from the Exchange to plaintiff conclusively establish that the yard was not a part of plaintiff's property for any purpose, but the private yard of the Exchange for the use of its members.

[2] 2. Even if the yard was not strictly private, it is clearly "other than a public delivery track" within the meaning of rule 5, section A, because by virtue of the leases only members of the Exchange had the legal right to use it, and they alone in fact did use it. Whether or not all Cincinnati hay and grain dealers were or were not eligible to membership in the Exchange is immaterial; membership therein was not a legal condition to engaging in the business in Cincinnati.

[3] 3. Clearly, too, these cars, though not intended to be unloaded in the plugging yard, were cars subject to demurrage under rule 1 as "cars held for or by consignors or consignees for loading, unloading, forwarding directions or for any other purpose."

[4] 4. Not only are the provisions of rule 2, section B-4, inapplicable to cars not placed for inspection, but the testimony of the arrangement between the parties prior to the lease, if it could be considered, justified the conclusion that the parties intended what the rule itself fairly interpreted means —that only cars actually placed in the plugging yard and bulletined there, and not those held out because of congestion at the plugging yard, were to be governed by rule 2, section B-4, as to demurrage.

Judgment affirmed.

Opinion of Judge Peck in the District Court Filed February 6, 1923.

This case involves the following questions: (1) Has this court jurisdiction of so much of the claim as is for demurrage on cars moved in intrastate commerce? (2) Is the "plugging yard" an instrumentality of the railroad or a private facility of the Grain and Hay Exchange? (3) Is plaintiff entitled to demurrage on cars constructively placed by it while they were still in the yards of its connections and before they got upon its rails? (4) Is the claim subject to the defense that cars consigned to other members of the Exchange were "run around" the cars in question while upon constructive placement?

[5] 1. The demurrage accrued during federal control, under tariffs established by the Director General. Therefore, the case arises under a law of the United States relating to interstate commerce within paragraph 8, § 24, of the Judicial Code (Comp. St. § 991), and the court has jurisdiction. Northern Pacific Railway Co. v. North Dakota, 250 U. S. 135, 39 S. Ct. 502, 63 L. Ed. 897; L. & N. R. R. Co. v. Rice, 247 U. S. 201, 38 S. Ct. 429, 62 L. Ed. 1071; Adams Express Co. v. Croninger, 226 U. S. 491, 33 S. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257; St. Louis, etc., Ry. v. Starbird, Administrator, 243 U. S. 592, 37 S. Ct. 462, 61 L. Ed. 917; N. Y. C. R. R. Co. v. Mutual Orange Distributors, 251 F. 230, 163 C. C. A. 386; Wells Fargo & Co. v. Cuneo (D. C.) 241 F. 726; Id. (D. C.) 241 F. 727.

[6] 2. The plaintiff does not own this yard. It is leased, at annual rental of $5,000, by the Grain and Hay Exchange from the Louisville & Nashville Railroad. The latter owns the land and also owns tracks, but does not operate them because of its failure to obtain right of way leading thereto. The plaintiff serves the yard with its switch engine, hauling cars to and from its own yards and points of connection with the other railroads in and about Cincinnati. Therefore, for present purposes the Grain and Hay Exchange may be considered as the owner of the yard with its trackage. The plaintiff is entitled to use the yard only for the service of the members of the Exchange. Their business is the receiving of these carloads of hay, the partial unloading, inspection, and grading of the same, the sale thereof, and the reconsignment of the cars to the purchasers. The yard is usually the destination of the original haul. It is clearly a private yard, and not a general railroad facility. The public has no right to any service whatever in it. That it facilitates the handling of freight, relieves the general yards, and is advantageous to the railroad, is beside the mark. The same is true in a greater or less degree of every private industrial switch.

With no small degree of force defendant points to the fact that the plaintiff collects

from members an inspection charge for the privilege of partially unloading and examining at this yard cars consigned to them. If the tracks be private and the cars delivered thereon be subject to demurrage when held beyond free time, it is difficult to perceive any basis for charging the consignees for the privilege of there inspecting the contents by their own employés. It is also true that the defendants are accorded the privilege of receiving notice of arrivals by bulletins at the yard, under Rule 2–4–B. This apparently only applies to "stations," which, it is claimed, must be understood to mean portions of the railroad itself as distinguished from private tracks. And it is argued that the plaintiff has thus designated this yard as a station—therefore, a public facility. The circumstances of the situation suggest a schedule-making problem; but that would be for the Interstate Commerce Commission.

The plaintiff may be in error in assessing the inspection charge. That, of course, is not now decided, because it is not directly involved in this case. In any event, this circumstance is not controlling, nor is the fact that the parties have agreed to accept notice of arrivals by bulletin. Those matters are only indicative of the views of the parties concerning the status of this yard and cannot override the fact that the yard is, by its very ownership, holding, and tenure, a private one.

3. The third question relates to 25 out of the 40 cars in question. They came to Cincinnati over other carrier lines by which they were held for the Pennsylvania Railroad, to be delivered to the plugging yard. This the Pennsylvania Railroad could not do on account of the congested condition of the yard. The other carrier lines charged the Pennsylvania $1 per day for each car, in accordance with the per diem agreement among railroads; and they were in turn accountable to the lines owning the respective cars for a like rental. Therefore the Pennsylvania constructively received the cars and held them, as it were, on storage in the yards of the carrier lines, waiting until defendant's situation was such as to permit it to complete its duty as the final carrier. Plaintiff meanwhile placed them constructively by giving notice to consignee. It is the defendant's contention that the fifth demurrage rule of plaintiff's tariff applies only when it is the carrier, and not when it is the switching line.

[7] But the rule declares that "the switching line will notify consignee and put such cars under constructive placement." Inasmuch as the switching line takes constructive possession of the cars from the carrier line under the per diem agreement, it is thought that the demurrage is to be assessed in accordance with the tariff of the former. But should this not be so, nevertheless it is undoubted that the delivering carrier may collect all charges from the consignee, including those of its connections. Wabash R. R. Co. v. Pearce, 192 U. S. 179, 24 S. Ct. 231, 48 L. Ed. 397; P. C. C. & St. L. v. Fink, 250 U. S. 577, 40 S. Ct. 27, 63 L. Ed. 1151; N. Y. C. & H. R. Ry. Co. v. York & Whitney, 256 U. S. 406, 41 S. Ct. 509, 65 L. Ed. 1016. In the present case it is admitted that the demurrage tariffs of the carrier lines were the same as that of plaintiff; therefore, the demurrage accrued under the one or the other, and the plaintiff is entitled to sue for and collect it under either.

[8] 4. The second and third defenses made by the answer are, by consent of defendant's counsel, to be treated as one. They aver that cars consigned to other members of the Grain and Hay Exchange arriving at the various railroad yards in Cincinnati were, in some instances, delivered to the plugging yard earlier than prior arrivals consigned to the defendant. And it is claimed that the plaintiff is not entitled to ask demurrage when it might have placed defendant's cars earlier if the strict order of arrival had been followed. It is not shown in how many instances this happened, or to what extent.

[9] Demurrage rule 8, section E, is as follows:

"Section E. *Railroad Errors Which Prevent Proper Tender or Delivery.* Under this rule demurrage will be charged on the basis of the amount that would have accrued but for such errors. This also applies in the case of constructively placed cars being 'runaround' by actually placing recent arrivals ahead of previous arrivals."

Plaintiff admits that it had no right to charge demurrage for delay caused by running one car around another which was on placement and consigned to the same person. It asserts, however, that there was no impropriety in running cars consigned to one member around cars on constructive placement consigned to another member of the Exchange, and that for delays so caused to the car on placement it may collect demurrage. This contention cannot be sustained. Constructive placement is permissible only after physical tender of the car or circumstances which excuse it, as inabil-

ity to accept for causes attributed to the consignee. Union Bag & Paper Corp. v. Director General, 61 Interst. Com. Com'n R. 424. The inability of the consignee to accept the first arrived car can only be considered to continue until opportunity to place it in the yard occurs. If the plaintiff prefers to fill the space first vacated by a subsequently arrived car, the failure to deliver the first car is no longer caused by the inability of its consignee to receive it, but by the election of the railroad to use the available space for the delivery of the subsequent arrivals. Under the rule quoted, the "running around" of cars so placed by subsequent arrivals was a railroad error preventing proper delivery of the former and requiring demurrage thereon to be charged on the basis that would have accrued but for such error.

The evidence shows, and there is no denial of it, that such errors did occur in the present case. To what extent, and with reference to what cars, it is not shown. A correct disposition of the controversy requires proof upon this subject. The parties will be given two weeks to agree. If they cannot do so, it will be audited.

## Supplemental Opinion of Judge Peck Filed March 27, 1923.

Since the filing of the opinion on the merits, the parties have agreed upon the extent of the "runarounds" but are now in disagreement as to whether the consignees were entitled to 48 hours' or to 24 hours' free time under the demurrage rules. If defendants had 48 hours, it is agreed that plaintiff would, under the holdings heretofore announced in this case, be entitled to recover $296.64; on the other hand, if they were entitled to but 24 hours, then the amount of their recovery should be $441.87.

[10] By rule 2–A, 48 hours' free time is allowed for loading or unloading. These cars were not loaded or unloaded, but were "plugged," that is to say, enough of the contents was removed to reveal to the inspectors the character of the remainder. The carload was then sold on sample. So much of the contents as had been removed were replaced and the car was reshipped, ordinarily on new billing, to the purchaser. By rule 2–B–2, when cars are held for reconsignment or reshipment of the freight in the same car in which it was received, the free time is but 24 hours. The words "are held" are shown by rule 1 to mean held either by consignors or by consignees. The evidence shows that these cars were held by consignees in the "plugging yard" for reshipment (the word "reconsignment" was used in the former opinion inadvertently and without regard to its technical meaning), and therefore the rule last referred to applies. Defendants were entitled to only 24 hours' free time; consequently, the judgment must be for the sum of $441.87.