**SOUTHERN RY. CO.**
v.
**ALUMINUM CO. OF AMERICA.**

No. 11800.

United States Court of Appeals
Sixth Circuit.

Feb. 10, 1954.

Clyde W. Key, Knoxville, Tenn., Charles H. Smith, Knoxville, Tenn., Charles M. Little, Washington, D. C., on brief, for appellant.

R. R. Kramer, Knoxville, Tenn., John S. Burchmore, Chicago, Ill., W. W. Collin, Jr., Pittsburgh, Pa., Charles E. McNabb, Knoxville, Tenn., on brief, for appellee.

Edward M. Reidy, W. W. Peck, Washington, D. C., on brief amici curiæ Interstate Commerce Commission.

Before SIMONS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

PER CURIAM.

The Southern Railway Company sued the Aluminum Company of America for demurrage charges amounting to $99,-499.96 and interest covering the period from April 1, 1945, to October 31, 1946. The district court dismissed the complaint and the Railway Company appeals.

The Aluminum Company of America commenced its operations at Alcoa, Tennessee, in 1913, where it now owns and operates aluminum reduction and fabricating plants and a carbon electrode plant. At the time appellee company began its operations, the railroad did not have, at Alcoa, adequate yard and switching facilities for the storage of freight cars and, as a result, appellee company constructed, on its own property and at its own expense, adequate track facilities of an extensive nature for the marshalling and sorting of cars preparatory to spotting them for loading and unloading purposes at appellee's plants; and such facilities were considerably in excess of what would otherwise have been required for its operations. At that time, it was contemplated by both parties that the railroad company would perform all switching services. The track facilities, or yard, were enclosed by a fence, the gates of which were left open; but the three plants of appellee company were enclosed by a fence, the gates of which were kept locked, except when opened for railroad, or similar service. For the first eight years, the Aluminum Company's yards were, in fact, yard switching tracks used by the railroad principally for marshalling, sorting, and classifying freight cars destined to or received from appellee company. Time was computed under the demurrage rules only after empty cars had actually been placed by the railway at loading points designated by the Aluminum Company; and no demurrage was charged by the railway, or paid by appellee, on empty cars while they were stored or standing in appellee's yards. In November 1920, the railway gave notice it would not perform the switching services in the future. But it was the evident intention, as found by the district court, that the Aluminum Company's yards would be used thereafter, as they had been previously used, by the railroad as an assembly or storage yard. Thereafter, as appellee's business increased, it enlarged its plants and constructed new track facilities, or yards, at a new location so as to provide ade-quate yards, in keeping with advancing growth, for the marshalling, sorting, classifying, and interchanging of cars. No change was made in the demurrage accounting practices. Up until November 1, 1946, no demurrage was charged or demanded by the railway, and throughout this period, all loaded cars consigned to appellee's plants, as well as all empty cars intended therefor, were placed by the railway in appellee's yards upon tracks designated therefor. The Aluminum Company moved such empty cars as were needed for loading to the proper loading points, and also moved such loaded cars from the yards to the proper unloading points in its plants; and, when unloaded, moved these empty cars to points for loading. Daily reports were furnished by the Aluminum Company to the railway indicating the dates on which the company removed empty cars from the yards and the company informed the railway daily of the number of empty cars it would require for loading its shipments. During the period from 1921 to 1946, time was computed against the Aluminum Company, for demurrage purposes, as though the cars delivered by the Railway Company were delivered to and accepted by the company at the times they were removed by the company from the tracks in the yards and taken to the loading points in the plants; and during all the period for which recovery for demurrage is sought, the company paid to the railway the full demurrage at the rates fixed in the railway's tariffs, on the above basis of delivery and acceptance of the cars.

Appellant Railway Company contends that the parties' interpretation of the demurrage tariffs filed with the Interstate Commerce Commission has, since 1921, been erroneous; and that demurrage should have been calculated from the time of delivery of the cars to the yards, or when loaded cars were empty and to be reloaded, rather than from the time of spotting or placing the cars at loading points. Appellee claims that the practice followed since 1921 was consistent with the tariffs and that, having paid all demurrage accruing on that ba-

sis, they were not liable for claimed demurrage at the time of suit. Both parties agree that the published tariffs of the Railway Company are binding on them, and that liability thereunder cannot be waived by any arrangement, understanding, or course of conduct between them.

The district court held that the railway tariffs imposed no liability on the appellee for the claimed demurrage, and that the interpretation of the tariffs by the parties, under which demurrage had been charged and paid, was correct.

The rules embraced in the tariffs provided that cars held for or by consignors or consignees for loading, unloading, forwarding, or for any other purpose, were subject to demurrage; that cars for loading would be considered placed when such cars were actually placed or held on orders of the consignor; and that actual placement was considered to be made when a car was placed in an accessible position for loading or unloading, or at a point previously designated by the consignor or consignee.

The district court found that there was no actual placement of cars when they were received into the yards, and that such cars were not ordered by appellee within the meaning of the rule. Moreover, the district court found that there was never a definitely established interchange track, referred to in the rules, where cars were placed by the railway and on which delivery would be absolutely accepted or returned; and that the cars for which demurrage was claimed were not held in the yards on order of the appellee company. In arriving at its findings and conclusions, the district court found persuasive the fact that the railway had no adequate yard facilities near appellee's plants to store cars so as to have them available for its use; that the only adequate available yard space which the railroad itself had for appellee's requirements was at Knoxville, Tennessee; that proper operation of the railway's business would have required it to maintain a pool of cars at Knoxville in approximately the same number as were kept in the yards at appellee's plant, and would have required it to move these cars from Knoxville to appellee's plants when ordered for loading; that the fundamental principle and purpose of charges for demurrage was to prevent undue delay in the use of cars for transportation; that the situation reflected in this case with regard to the use of appellee's yards by the railway did not indicate any unusual delay in a holding of cars on appellee's request or because of appellee's fault; and that the result would have been the same had the railway maintained its own switch yard.

The evidence disclosed that what really took place was that the railway used the extensive track and yard facilities of appellee company as its own yards for sorting and marshalling cars in lieu of providing yards for that purpose near Alcoa, or using its yards at Knoxville.

The district court filed a persuasive and comprehensive opinion, together with findings of fact and conclusions of law in which were embodied the matters above set forth, as well as the legal authorities sustaining its determination.

The findings are amply supported by the evidence and no errors of law appearing, the judgment is affirmed for the reasons set forth in the opinion of Judge Darr, 119 F.Supp. 389.