**UNION PACIFIC RAILROAD COM-
PANY**

v.

**The UNITED STATES.**

**No. 316–68.**

United States Court of Claims.

Jan. 23, 1974.

———◆———

Martin Sterenbuch, Washington, D. C., atty. of record, for plaintiff; Cake & Sterenbuch, Washington, D. C., of counsel.

Michael J. Rubin, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before COWEN, Chief Judge, and SKELTON and BENNETT, Judges.

## OPINION

BENNETT, Judge.

This transportation case comes before us from the Trial Division on a decision by Trial Judge Willi. We adopt his findings of fact, with modifications, but reach a different legal conclusion for

reasons which hereafter appear, and conclude that plaintiff is entitled to judgment and that the counterclaim should be dismissed.

Plaintiff, Union Pacific Railroad Company, a Utah corporation, filed this suit on October 16, 1968, to recover unpaid demurrage charges of $5,385 which it had billed the Commodity Credit Corporation (CCC), an agency of the United States, on carlot shipments of wheat hauled by plaintiff from various Kansas points of origin to Denver, Colorado, during July and August 1966. On January 17, 1969, the United States, filed its answer denying liability on the claim asserted and stating a counterclaim of $7,880, plus interest. The counterclaim concerned demurrage charges assessed against CCC on wheat consigned to CCC at Denver and hauled there by plaintiff in July and August 1964.

For purposes of this decision, the court concludes that the facts respecting defendant's counterclaim are substantially identical to the facts respecting plaintiff's claim, except that the counterclaim shipments were in July and August 1964 and the demurrage charges, totaling $7,880, were paid by the CCC.

In the years in suit, unprocessed wheat was valued in the market place on the basis of federal grade and protein content.[1] In a given transaction these value indices were determined by laboratory analysis of a sample drawn from the bulk quantity of wheat involved. Since laboratory facilities under authorized management and supervision were essential to these determinations, trade practice found rail carriers typically affording carlot shippers of unprocessed wheat in-transit inspection privileges so that official grade and protein analysis could be conducted at relatively few focal points of rail movement rather than at myriad points of origin and final destination. Denver served as such a point

for the large volume of wheat grown in Kansas in 1964 and 1966.

Because of its route structure, plaintiff carried the bulk of wheat that came into Denver by rail in the mid-1960's. Peak movement occurred each year during July and August in the wake of harvest. The temporary congestion of rail facilities inherent in this seasonal pattern of wheat traffic was increased in 1964 and 1966 because in July and August of those years CCC routed approximately 10 million bushels of wheat through Denver to Portland, Oregon, for export sale to Japan. Most of this grain originated along plaintiff's lines.

Plaintiff had an inspection yard in the Denver terminal area with a capacity of nearly 200 cars during the years in suit. Under normal traffic conditions plaintiff's cars carrying CCC wheat under a Denver billing were brought into the terminal area and placed on plaintiff's inspection tracks. Plaintiff would notify the Denver Grain Exchange (DGE), the agent of the CCC in Denver, of the arrival of each individual car. The DGE would then send one of its inspectors to the yard to draw a grain sample for grade and protein analysis at DGE's Denver laboratory. When the test results were available, the DGE would telephone them to the CCC office in Kansas City and that office would telephone disposition instructions to plaintiff at Denver. Thereafter, the car would proceed to its final destination. In due course, the CCC Kansas City office would confirm in writing its telephone advice to plaintiff.

In the months of July and August 1964 and 1966, plaintiff's grain traffic into Denver was so great that its inspection yard was unable to accommodate all of the incoming CCC cars. In these circumstances, plaintiff placed many cars at hold points at distances ranging from 3 to 55 miles short of the Denver termi-

[1]. 7 U.S.C. § 76 (1964), ch. 313, part B, § 4, 39 Stat. 483 (1916). This section was amended in 1968. By this amendment Congress adhered to the recommendation of the Depart-ment of Agriculture and made the inspection requirement permissive instead of mandatory. Pub.L. 90–487, 7 U.S.C. § 76 (1970), 82 Stat. 762 (1968).

nal area. In some instances these cars overstayed the "free time" allotted by tariff for inspection purposes, and the demurrage charges in suit here were assessed.

The arrangement whereby incoming grain cars were placed at hold points short of Denver when the Denver inspection tracks were filled had been agreed upon by plaintiff and the DGE management long prior to the time periods in suit. This practice had been allowed for more than 20 years prior to this suit. In agreeing to inspect cars at such outlying points, DGE officials expected that plaintiff would use this accommodation only when space was not available in the Denver terminal area. Though it appears that plaintiff did not always limit its use of this procedure to instances of yard congestion, neither the CCC nor the DGE ever chose to make a formal complaint to plaintiff or the ICC regarding such deviations.

■ Within 24 hours of arrival at the Denver terminal area or at a hold point short of the Denver terminal of a car on which the disputed demurrage was imposed, plaintiff mailed a written notice of arrival to "Commodity Credit Corporation, Denver, Colorado." Plaintiff also prepared a bulletin notice respecting every car of CCC wheat consigned to Denver regardless of whether the car was placed in the terminal area or was stopped short at a hold point. These bulletin notices listed the number and location of all cars received in the Denver area since the previous bulletin notice. Though the written notices were all returned to plaintiff because CCC had no mailing address in Denver, the bulletin notices were received by the DGE inspectors daily, except Saturday and Sunday, before 7 a. m. As DGE was CCC's authorized agent in Denver, notice to it was the same as notice to the CCC. An excerpt from a January 7, 1954 CCC letter indicated that CCC accepted bulletining as adequate notice of car arrivals at stations, such as Denver, where official inspection was performed:

This office has always accepted bulletining of cars of grain, seeds or soybeans billed to CCC for inspection and disposition as due notice of arrival at stations in the states of Missouri, Kansas, Nebraska, Colorado and Wyoming, where bulletining and official inspection is provided. However, our attention has been directed to some instances where carrier agents cannot locate on file a written notice from this office of acceptance of bulletining as notice of arrival as prescribed in Rule 2 of Demurrage Tariff 4–A.

Therefore, in order to insure that the agents of the individual carriers at all stations concerned have a proper record on file, this letter shall constitute notification that this office accepts the bulletining of cars described above as due and adequate notice of arrival at stations where official inspection is performed.

Accordingly, this court concludes that the bulletin notice given by plaintiff and received by the DGE constituted good and adequate notice for purposes of this case.

When a car was stopped at a hold point outside Denver, the inspector and the DGE followed the same procedure as that employed in the case of CCC cars brought into the Denver terminal area for inspection. Except for the limited additional travel time to and from the various hold points, the CCC was not substantially prejudiced by the fact that cars consigned to Denver were stopped short of inspection at the terminal itself.

■ The single question confronting the court in this case concerns whether or not the demurrage charges assessed by plaintiff were proper. This inquiry concerns the construction, rather than the reasonableness, of a tariff or service order. Any question regarding reasonableness is properly the concern of an administrative tribunal. United States v. Western Pac. R. R., 352 U.S. 59, 63–65, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); United States v. Southern Ry., 380 F.2d 49, 53–54 (4th Cir. 1967); United

States v. Southern Ry., 364 F.2d 86, 91 (5th Cir. 1966) ; see also Union Pac. R. R. v. United States, 111 F.Supp. 266, 125 Ct.Cl. 390 (1953). To determine whether the demurrage charges were proper, the court must consider the language of Item 905, § D, of ICC Freight Tariff 4–G, issued September 18, 1964, by H. R. Hinsch, a railroad agent of Chicago, Illinois, and the terms of ICC Car Service Order 947, 28 Fed.Reg. 12127 (1963), and Second Revised Service Order 975, 31 Fed.Reg. 6058 (1966). Freight Tariff 4–G listed demurrage rules and charges established separately by each of the participating carriers, including plaintiff. The service orders were issued by the ICC and contained rules, regulations and procedures regarding freight car utilization. Both S. O. 947 and 2d Rev.S.O. 975 were issued without notice or public procedure because of emergencies regarding freight car utilization at the time of their issuance. The preamble to S.O. 947 stated that—

> * * * an acute shortage of freight cars exists in all sections of the country; * * * cars loaded and empty are unduly delayed in terminals and in placement at, or removal from industries; the present rules, regulations, and practices * * * are insufficient to promote the most efficient utilization of cars; * * *. [28 Fed.Reg. at 12127.]

The preamble to 2d Rev.S.O. 975 noted that—

> * * * the unprecedented level of the economy is placing tremendous pressures on railroad transportation facilities, causing such acute shortages of freight cars in all sections of the country as to close industrial plants, impede the movements of agricultural products and other goods to market; * * *. [31 Fed.Reg. at 6058.]

Subparagraphs (a)(1)(iv) of each of the two service orders contained language applicable to plaintiff's claim and defendant's counterclaim. Subpara-graph (a)(1)(iv) of 2d Rev.S.O. 975 provided that—

> (iv) Loaded cars held at destination for accessorial terminal services described in the applicable tariffs, such as holding for orders or inspection, shall be placed on unloading, hold or inspection tracks, and proper notice given within 24 hours, exclusive of Saturdays, Sundays, and holidays, after arrival at destination. On cars set off and held short of billed destination, or on cars held at destination and short of inspection tracks, a written notice shall be sent or given to consignee or other party entitled to receive such notice, within 24 hours of arrival, exclusive of Saturdays, Sundays, and holidays, at the hold point. Time and charges shall be computed from the first 7 a. m., following such notice and demurrage assessed in accordance with provisions of Service Order No. 979. [31 Fed.Reg. at 6059.]

Subparagraph (a)(1)(iv) of S.O. 947 provided that—

> (iv) Loaded cars held at billed destination for accessorial terminal services described in the applicable tariffs, such as holding for orders or inspection, shall be placed on carrier's or consignee's unloading or inspection tracks, within 24 hours, exclusive of Saturdays, Sundays, and holidays, after arrival at billed destination. On cars set off and held short of billed destination, a written notice shall be sent or given to consignee within 24 hours following the first 7:00 a. m. after arrival at hold point. [28 Fed. Reg. at 12127.]

■ Section D of Item 905 of Freight Tariff 4–G, applicable in July and August 1966, provided in pertinent part:

> On cars of grain * * * held in transit and placed for inspection or grading, including reconsignment or other disposition orders, the free time for disposition will expire at 6:00 p.

m. of the day following notice. * * *.

While this section might by its terms also contemplate cars set off and held short of billed destination, a review of subparagraphs (a)(1)(iv) of S.O. 947 and 2d Rev.S.O. 975 reveals that both of these paragraphs make specific reference to "cars set off and held short * * *." Since this case concerns freight cars "set off and held short" it seems proper for this court to rely on the aforementioned service orders for purposes of deciding this controversy. Carrier tariffs are normally controlling except insofar as they are in conflict with the terms of ICC car service orders. Fort Worth & Denver Ry. v. Goodpasture, Inc., 442 F.2d 1294, 1298 (5th Cir. 1971), aff'g Dist.Ct. opin. (S. D.Tex.); Reading Co. v. Commodity Credit Corporation, 289 F.2d 744 (3rd Cir. 1961). In employing this analysis, the court does not infer that Item 905, § D, is in conflict with subparagraphs (a)(1)(iv) of the two service orders nor inconsistent with the result we reach in this case. It only determines that the two aforementioned orders contain language much more specific than that found in Item 905, § D, and, accordingly, lend more guidance to the court's consideration of the issue before it without at the same time being in conflict therewith. It is clear from the language of subparagraphs (a)(1)(iv) that they apply to "[l]oaded cars held at [or short of] billed destination for accessorial terminal services * * * such as holding for orders or inspection." This was precisely the situation in the instant case since plaintiff's cars were held at or near Denver for inspection and disposition instructions. The subparagraphs required that written notice of arrival at destination be sent within 24 hours after car arrival regardless of whether the car arrived at its destination terminal or was "set off and held short of billed destination."

Bulletin notice of car arrival was also to be posted by 9 a. m. each day. This notice was to include all car arrivals since the previous bulletin. See Freight Tariff 4–B, issued Sept. 18, 1964, Item 905, § D, p. 57. No distinction was made in either the written notice or bulletin notice provisions between cars held short of destination and cars brought into the terminal. Notice of arrival was sent or posted regardless of whether a freight car actually made it within the terminal area or whether it was set off and held short of destination.

Defendant argues that questions regarding notice are not dispositive of the issue upon which this case turns. Even accepting that notice was good, defendant would argue that "demurrage cannot be exacted by a carrier unless the shipper or consignee is clearly at fault." Defendant also argues that the facts of the present case indicate that plaintiff was at fault and consequently no demurrage charges can be levied.

Defendant is wrong in its assertions for four principal reasons. In the first place, the assessment of demurrage charges in no way depends upon a finding of shipper or consignee fault. No reference to fault is contained anywhere in subparagraphs (a)(1)(iv) of S.O. 947 and 2d Rev.S.O. 975. Subparagraphs (a)(1)(iv) apply to accessorial terminal services performed not for the benefit of the carrier, but for the benefit of the shipper or consignee. As such, a requirement of shipper or consignee fault as a condition precedent to demurrage charges would amount to a complete reinterpretation by this court of subparagraphs (a)(1)(iv). Such a judicial undertaking would be beyond the competence of this court. United States v. Western Pac. R. R., supra; Great North. Ry. v. Merchants Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922). If such an interpretation were allowed, a shipper or consignee would be able to benefit from the accessorial services provided for in the subparagraphs while at the same time avoiding payment for such services.

Second, the decisions of the ICC do not support the proposition set forth by plaintiff regarding the matter of ship-

per or consignee fault. In Chrysler Corp. v. New York Cent. R. R., 234 I.C. C. 755 (1939), Chrysler was required to pay demurrage assessed against it by defendant when defendant was prevented from removing its cars from Chrysler property on account of a take-over strike at a number of Chrysler plants. The commission found that as between Chrysler and defendant "it was primarily complainant's right and duty to open its gates, * * *." 234 I.C.C. at 757. The commission rejected Chrysler's proposed interpretation of the applicable demurrage tariff and concluded that—

> * * * [d]emurrage may properly be assessed where the detention occurs through no fault of the shipper, even though the cause of detention is beyond the shipper's control. [234 I.C.C. at 758.]

Similarly, in Pennsylvania R. R. v. Moore-McCormack Lines, Inc., 370 F.2d 430 (2d Cir. 1966), aff'g 246 F.Supp. 143 (S.D.N.Y.1965), demurrage charges levied pursuant to an ICC tariff were determined to have been properly assessed. There, a strike of the consignee's sea-going employees caused independent stevedores to refuse to cross picket lines to unload plaintiff-carrier's lighters so that cargo would be delivered to defendant-consignee for export. In upholding plaintiff's demurrage assessments, the court stated that the—

> * * * general rule is that demurrage is extended freight and, where there has been an excess of lay days over those stipulated, the consignee is liable to pay demurrage for those excess days regardless * * * except * * * (2) where the delay is the fault of the carrier * * *. [370 F.2d at 432.]

As in Chrysler, the court found that the strike was not the carrier's fault and that defendant-consignee was not thereby relieved of its obligation to pay demurrage. The court also noted that "absence of fault in the shipper or consignee [was] not sufficient to excuse it from liability for demurrage." *Id.* In reaching this determination, the court noted in a footnote that "[a] few courts have held to the contrary, *e. g.*, St. Louis, Southwestern R. R. v. Mays, 177 F.Supp. 182 (E.D.Ark.1959); Southern R. R. v. Alcoa, 119 F.Supp. 389 (E.D. Tenn.1951), affirmed 210 F.2d 139 (6 Cir. 1954). * * *." [370 F.2d at 432.]

Defendant has cited both *Mays* and *Alcoa* for the proposition that fault is necessary for demurrage assessment. Both cases, however, express the minority rule and can be distinguished. Both cases involved demurrage charges assessed under a carrier tariff on cars held for loading and unloading rather than demurrage charges resulting from accessorial terminal services beneficial to a shipper or consignee under an explicit provision of an ICC car service order. In *Mays*, plaintiff filed a motion for summary judgment for the assessment of demurrage charges. Defendant answered, alleging that plaintiff's employees contributed to the delay, and hence caused the assessment of demurrage charges. This allegation raised factual issues which, if true, would have led to a denial of plaintiff's claim. The district court accordingly denied the motion for summary judgment so that the factual matters raised by defendant could be resolved. *Alcoa* was a case which turned on the interpretation given, over an extended period of time, by a carrier and a shipper-consignee to a carrier-drawn tariff provision.

At oral argument defendant called the court's attention to a decision of the ICC, Holding of Loaded Grain Cars— Texas Gulf Ports, Export, 321 I.C.C. 328 (1963), said to be consistent with *Alcoa* and *Mays*. There, the ICC opined that "to allow the collection of demurrage charges by * * * respondents as a result of their own disability at these ports would be to permit them to profit through their own fault." 321 I.C.C. at 330. Accordingly, the ICC considered and approved a tariff for the special circumstances surrounding the Galveston, Texas situation. The tariff provided that the notice sent when a shipment

reached the Galveston yards would not issue until the freight car was actually brought into the Galveston yards. Since time did not run on a shipment until notice was sent, the new Galveston rule prevented the expiration of free time and the accrual of demurrage charges until a freight car was actually brought into the yards. Apparently, the slightest rumors of overcrowding at Galveston had been enough to send grain shippers scurrying for other lines over which to ship their grain. Since it was impractical for the railroads to enlarge the Galveston yards in order to accommodate peak periods, the next best practical solution was to change the notice time so that shippers would not be inclined to redirect their shipments. In its analysis the ICC noted that the "periods of congestion \* \* \* [were] few at Galveston." For this reason, the ICC found that "there [was] nothing to indicate that the proposed rules would actually tend to increase the use of rail cars \* \* \*." 321 I.C.C. at 330.

The *TGP* administrative decision has no bearing here for several reasons: (a) No determination has been made by this court that plaintiff was responsible for delays caused by its lack of terminal facilities. On the contrary, this court has found that the overcrowded conditions at Denver were the result of a peak in harvest and the routing of unusually large shipments of grain through Denver to Japan. (b) The peculiar circumstances at Galveston are not found in this case. Regular inspection procedures at Denver contemplated the taking of grain samples from cars brought into the Denver terminal as well as from cars set off and held short of the terminal. Notice issued as soon as a car was brought to the Denver area and placed at the terminal or at a hold point away from the terminal. (c) The *TGP* ruling concerned the reasonableness of a carrier-proposed tariff. As has already been noted, such a matter must first be considered by an administrative tribunal charged with such duty by Congress. United States v. Western Pac. R.R., *supra*. (d) The

*TGP* carrier tariff proposal was provoked by a tariff section similar to 2d Rev.S.O. 975(a)(1)(iii). In *TGP* the two railroads sought to delay notice so that bottlenecks occurring at their terminal facilities would not give rise to immediate assessment of demurrage charges. As is noted below, subparagraphs (a)(1)(iii) were not applicable to the facts of this case.

The *Chrysler—Moore-McCormack* rationale that absence of shipper or consignee fault was not sufficient to excuse it from liability for demurrage was followed by the Fifth Circuit in Port Terminal R.R. Ass'n v. Connell Rice & Sugar Co., 387 F.2d 355 (5th Cir. 1967), and noted favorably in Houston Belt & Terminal R.R. v. Connell Rice & Sugar Co., 411 F.2d 1220 (5th Cir. 1969), cert. denied, 397 U.S. 908, 90 S.Ct. 905, 25 L. Ed.2d 89 (1970).

■ Third, there have been other instances in transportation law where fault has had little relation to assessment of tariff charges. Even though a carrier might erroneously quote a price to be charged for shipment of goods, the shipper or consignee is nevertheless liable for the actual published tariff rate and not the price erroneously quoted to it. This is true despite the fault of the carrier. 49 U.S.C. § 6(7); Atchison, Topeka & Santa Fe Ry. v. Bouziden, 307 F.2d 230, 234 (10th Cir. 1962).

Fourth, a reference to shipper or consignee fault is found in subparagraphs (a)(1)(iii), but these subparagraphs are inapplicable to the present case. Subparagraphs (iii) reference car delivery to "an industrial interchange track or to other than a public delivery track \* \* \*." No such deliveries, however, were contemplated or made by plaintiff in this case. Reference to subparagraphs (iii) in this case can only have arisen from a mistaken reading of the applicable service orders. Subparagraphs (iii) state that if car delivery cannot be made to a particular type of track on account of the fault of a shipper or consignee, the car will be held

back, notice will be sent, and demurrage charges will begin to accrue. Though subparagraphs (iii) are fully in keeping with the purpose of promoting efficient car utilization in that they encourage shippers and consignees to remove obstacles to car delivery or face the consequence of demurrage charges, they are nevertheless, by their terms inapplicable to the circumstances of this case. Subparagraphs (iii) only apply to a particular set of circumstances; that is, instances where terminal bottlenecks, attributable to shipper or consignee fault, make it impossible for cars in transit to be brought to their final destination point. Demurrage charges for cars which arrive at a terminal area for loading or unloading, but then are held beyond their allotted "free time" are assessed under subparagraphs (a)(2) of the applicable service orders. *See* S.O. 947(a)(2), 28 Fed.Reg. at 12127; 2d Rev.S.O. 975(a)(2), 31 Fed.Reg. at 6059.

■ For the reasons stated, this court concludes that judgment in the amount of $5,385 should be entered for plaintiff and that defendant's counterclaim should be dismissed.

SKELTON, Judge (dissenting):

I respectfully dissent. The railroad cars in this case were not delivered to the defendant consignee in Denver, Colorado, due to the fault of the plaintiff railroad in failing to have sufficient trackage in Denver to accommodate the cars. A number of cases have held that the lack of trackage or other facilities to handle cars is the fault of the railroad. This identical question was decided by the Interstate Commerce Commission (ICC) in the case of Holding of Loaded Grain Cars—Texas Gulf Ports, Export, 321 I.C.C. 328 (1963). In that case the railroad lacked sufficient facilities at Galveston, Texas, to accommodate railroad cars consigned to such city. The question involved was whether or not the railroad could collect demurrage on cars held short of destination because of the lack of facilities of the railroad at Galveston. The ICC held that such de-

murrage charges could not be made because that would allow the railroad to profit *through its own fault*. The ICC opinion states:

* * * [T]o allow the collection of demurrage charges by * * * respondents as a result of their own disability at these ports would be to permit them to profit through their own fault. * * * [*Id.* at 330.]

See also, Staten Island Rapid Transit Ry. v. Marshall, 136 App.Div. 571, 121 N.Y.S. 82 (N.Y.Supreme Ct.1910) where the court held that demurrage could not be collected on cars held short of destination because of the fault of the railroad in having its tracks congested at the point of destination.

These cases show clearly that in the instant case the lack of trackage at Denver was the fault of the railroad and consequently, its failure to deliver the cars to Denver was also its fault. Certainly, no one could argue that the lack of trackage in Denver was the fault of the consignee.

The fault of the railroad in failing to deliver the cars at destination having been established, the controlling question in this case is whether or not the railroad can charge and collect demurrage on cars held by it at points short of destination sometimes as far away as 55 miles, due solely to the fault of the railroad. The correct rule under these circumstances is set forth in the case of St. Louis, Southwestern R. R. v. Mays, 177 F.Supp. 182 (E.D.Ark.1959), where the court said:

* * * In order for a liability for demurrage to exist, however, the failure to load or unload the cars within the free time must be the fault of the shipper or consignee; and, conversely demurrage cannot be charged where such failure was due to the fault of the carrier. 9 Am.Jur., supra, [Carriers] § 606; Southern R. Co. v. White, supra [6 Cir., 284 F. 560, 26 A.L.R. 1429]; Southern Ry. Co. v. Aluminum Co. of America, D.C.Tenn., 119 F.Supp. 389, affirmed 6 Cir., 210 F.2d 139. [*Id.* at 184.]

This rule is also set forth in the case of Southern Ry. v. Aluminum Co. of America, 119 F.Supp. 389 (E.D.Tenn. 1951), aff'd 210 F.2d 139 (6th Cir. 1954), where the court said:

No demurrage can be exacted by a carrier unless the delay in loading is clearly attributable to the fault of the shipper or consignee. United States Fidelity & Guaranty Co. v. Central of Georgia R. Co., supra [226 Ala. 606, 147 So. 891, 87 A.L.R. 1028.] [*Id.* 119 F.Supp. at 396.]

This rule is also stated in 13 C.J.S. Carriers § 345 (1939) as follows:

§ 345. Excuses for Nonpayment

Payment of demurrage is usually excused or avoided if the detention or delay in unloading for which the charge is sought to be made was due to the fault of the carrier rather than a default or breach of duty of the consignee or shipper; * * *. [*Id.* at 810.]

See also, 13 Am.Jur.2d Carriers §§ 484, 485 (1964); Louisville & Nashville R.R. v. Camody, 203 Ala. 522, 84 So. 824 (1919); Granger v. Davis, 2 F.2d 695 (6th Cir. 1924); Staten Island Rapid Transit R.R. v. Marshall, *supra*; Pennsylvania R.R. v. Moore-McCormack Lines, Inc., 370 F.2d 430 (2d Cir. 1966), aff'g 246 F.Supp. 143 (S.D.N.Y.1965); and Port Terminal R.R. v. Connell Rice & Sugar Co., 387 F.2d 355 (5th Cir. 1967).

The majority opinion cites the case of Chrysler Corp. v. New York Cent. R.R., 234 I.C.C. 755 (1939) in opposition to the foregoing rule. Actually, the case is inapposite because there the railroad was unable to deliver its cars to the consignee, the Chrysler Corporation, because of a strike of Chrysler's employees. There was no fault whatever on the part of the railroad and consequently it was entitled to charge demurrage because of the strike of Chrysler's employees. That decision has no application to the instant case.

The majority also cites Pennsylvania R.R. v. Moore-McCormack Lines, Inc., *supra*, as being contrary to the general rule stated above. That case also involved a strike of the consignee's employees which prevented the railroad from delivering the cars. There was no fault on the part of the railroad and it was entitled to collect demurrage. The decision of the court is actually authority for the defendant in the instant case, because the court stated in its opinion as follows:

The general rule is that demurrage is extended freight and, where there has been an excess of lay days over those stipulated, the consignee is liable to pay demurrage for those excess days regardless of what brought about the delay *except * * * (2) where the delay is the fault of the carrier or those for whom he is responsible*; * * *. [*Id.*, 370 F.2d at 432.] [Emphasis supplied.]

The majority also cites the case of Port Terminal R.R. v. Connell Rice & Sugar Co., *supra*, as being against the general rule. Actually it supports the general rule and is definitely authority in favor of the defendant in the instant case. In that case, the railroad was unable to deliver 21 cars because of a strike of its own employees. The court held that this was the fault of the railroad and by reason thereof, it was not entitled to charge demurrage on the cars held short of destination. In this regard, the court stated:

Turning now to the 21 cars that arrived in plaintiff's yards in December, I am of the opinion that the defendant is not liable for demurrage on these cars. While the consignee normally is liable for demurrage regardless of what brought about the delay, there *are some exceptions. One of the exceptions is applicable here; namely, where the delay is the fault of the carrier or those for whom the carrier is responsible.* See, Pennsylvania R. R. Co. v. Moore-McCormack Lines, Inc., supra. [370 F.2d 430 (2d Cir. 1966), aff'g 246 F.Supp. 143 (S.D.N.Y.1965)]. [Emphasis supplied.] [*Id.*, 387 F.2d at 357.]

As can be seen from the decision of the court, that case is definite authority for the defendant in the instant case. The court in the case last cited went on to discuss the strike cases so heavily relied on by the majority in the instant case which seems to me to show that this reliance by the majority on the strike cases is misplaced. In this regard, the court said:

The parties have not cited nor has the Court found any cases involving facts similar to those involved here. All of the "strike delay" cases are concerned with only one strike by employees of the consignee or a third party. See, e. g., Reading Co. v. Dexter-Carpenter Coal Co., 96 F.Supp. 650 (S.D.N.Y.1951); Chicago, B. & Q. R. Co. v. Blunk, 101 F.Supp. 219 (S.D. Iowa 1951). These cases are easily distinguishable from the instant case in that the primary cause of the delay here was the action taken by plaintiff's employees. Had plaintiff's employees not struck, it is obvious that the cars could have been unloaded long before the longshoremen began their strike. The defendant should not be penalized for the delay caused by the longshoremen's strike when there would have been no delay at all had it not been for the strike of plaintiff's employees. [Id., 387 F.2d at 357.]

The case of Houston Belt & Terminal R.R. v. Connell Rice & Sugar Co., 411 F.2d 1220 (5th Cir. 1969), cert. denied, 397 U.S. 908, 90 S.Ct. 905, 25 L.Ed.2d 89 (1970), cited by the majority is not in point in the instant case because it involves the constructive placement of cars short of destination due to the fault of the consignee. The railroad was not at fault. Consequently, demurrage was allowed. Those facts do not exist here. There is no fault on the part of the consignee; there was no constructive placement by the railroad; and all of the fault lies with the railroad.

Turning now to a consideration of the tariffs in the instant case, it should be pointed out that all of the provisions of a tariff must be considered in determining the meaning of each of its provisions. See Southern Pacific Transportation Co. v. United States, 454 F.2d 740, 197 Ct.Cl. 143 (1972), where we held:

* * * A corollary rule of tariff and document interpretation, equally axiomatic, is that all provisions of a tariff or document are to be considered in determining the meaning to be ascribed to one provision thereof, and that meaning should be given which will give reasonable meaning to all provisions and not render a part thereof mere surplusage or create conflicts. Container Transp. Int'l v. United States, 437 F.2d 1365, [194 Ct.Cl. 320] (1971); Southern Ry. v. United States, 156 F.Supp. 740, 742, [140 Ct.Cl. 413, 416] (1957); United States v. Missouri-Kan.-Tex. R.R., 194 F.2d 777, 778 (5th Cir. 1952). [Id., 454 F.2d at 745, 197 Ct.Cl. at 151.]

Trial Judge George Willi correctly applied this rule in interpreting the tariff in the instant case. In this regard, it should be noted that the ICC Second Revised Service Order No. 975, as amended, provides in paragraph (1)(i) that loaded cars will be subject to demurrage after placement following arrival at destination.

Paragraph (1)(ii) provides that actual placement means placing of a car on industrial interchange tracks or other than public delivery tracks serving the consignee or on public delivery tracks.

Paragraph (1)(iii) provides that where the railroad is unable to deliver a car because of the fault of the consignor or consignee, it can make a constructive placement at a hold place short of destination.

The trial judge correctly interpreted the foregoing paragraphs of the service order as meaning that cars are subject to demurrage when actual placement is made at destination or where a constructive placement is made at a hold point short of destination due to the fault of the consignor or consignee.

Paragraph (1)(iv) of the service order mentions cars set off and held short

of destination by the railroad, but says nothing about the right of the railroad to collect demurrage when it holds cars short of destination due to its own fault. It is axiomatic and well-established that a railroad can only collect charges that are provided for and authorized in the tariff which it has filed with the ICC. The trial judge correctly decided that since the tariffs here do not provide that a railroad can charge demurrage on cars held short of destination due to its own fault, the railroad is not entitled to collect such charges. Of course, that is exactly the situation in the instant case.

It is well settled that a tariff must be given a reasonable interpretation, and if there is any ambiguity, it must be resolved against the carrier and in favor of the shipper or consignee. *See* C & H Transportation Co. v. United States, 436 F.2d 480, 193 Ct.Cl. 872 (1971) and Hughes Transportation, Inc. v. United States, 169 Ct.Cl. 63 (1965).

According to these authorities, if there is any vagueness or ambiguity in the tariff, it must be resolved in favor of the defendant. We held in the *Hughes Transportation Inc.* case, *supra:*

> We must give the tariff a fair reading, and cannot impart any unreasonable ambiguities. * * * [*Id.* at 68.]

In my opinion, it is clearly unreasonable to interpret the tariff in the instant case in such a way as to authorize the railroad to hold cars as far away as 55 miles from destination due to its own fault and recover demurrage when it does so. By way of illustration, this is equivalent to saying that if a car had New York City as its destination, the railroad could hold it in the vicinity of Philadephia and collect demurrage even though the holding of such car is due to its own fault. Such a procedure is contrary to our established rules governing the charging and collecting of demurrage by railroads, and is a strained and unreasonable interpretation of the tariffs in the instant case.

The reliance by the majority on Section D of Item 905 of Freight Tariff 4–G, applicable in July and August 1966, providing as follows, is misplaced:

> On cars of grain * * * held in transit and placed for inspection or grading, including reconsignment *or other disposition orders*, the free time for disposition will expire at 6:00 p. m. of the day following notice. [Emphasis supplied.]

This provision clearly means and applies to cars held for these purposes *on orders of the consignor or consignee*. There were no such orders in this case. If this tariff is interpreted to mean that the railroad can arbitrarily hold a car at a point as far from destination as 55 miles because it lacks trackage facilities at destination and thereafter charge demurrage, what is to prevent it from holding the car 75 or 100 miles short of destination or even further? This cannot be the law. Also, I emphasize that there is nothing in this part of the tariff, or any other part, that authorizes the railroad to collect demurrage when it holds a car short of the destination due to its own fault.

Finally, it is significant that the majority has not cited a single case, and I have not found one, holding that a railroad can collect demurrage on a car it held short of destination due solely to its own fault. On the other hand, the cases uniformly hold, as shown above, that demurrage cannot be collected under these circumstances.

Accordingly, I would enter judgment in favor of the defendant and would dismiss the plaintiff's suit. I would also allow defendant to recover on its counterclaim.